VAN ALST and others *against* HUNTER and others.

A motion for a second trial of a feigned issue, directed by the Court, to try the validity of a will, made the second term after that in which the N. P. Record and Judge's certificate had been filed, and upon an *ex parte* statement of the evidence given at the trial, was denied, on the ground of the delay, and the want of the proper documents.

But a new trial may be moved for and granted at the final hearing, on the equity reserved.

Though it is the most usual course to award a second trial on a feigned issue, in cases touching the inheritance, where the verdict is in favour of the will, and against the heir at law, yet it rests entirely in the discretion of the Court to award a second trial or not, according to the circumstances and testimony in the case.

*Nov.* 9, 1820, and *Feb.* 13, 1821.

THE plaintiffs, *Abraham Van Alst* and twenty others, being heirs at law of *Jacob Bennet*, deceased, filed their bill on the 4th of *November*, 1818, against the defendants, *George Hunter*, and *Anne* his wife, and *David C. Van Alst*, to set aside the will of *Bennet*, on the ground of the incompetency of the testator.

The testator died on the 22d of *April*, 1817, leaving the plaintiffs, and the defendants *Anne Hunter* and *D. C. V. A.* his heirs at law. On the 10th of *January*, 1816, the testator made a will and codicil set forth in the bill, by which he gave to the defendant *Hunter*, and *Anne* his wife, the farm on which the testator then lived, at *Newtown*, in *Queen's* county, in fee, charged with the payment of 1,750 dollars, to the other defendant, *D. C. Van Alst*, the grandson of the testator. He also devised to them, his negroes, furniture, and stock on his farm, and directed his executors to pay his debts out of his personal estate not before bequeathed, and authorized them to sell his lands in *King's* county; and all the residue of his estate, of what nature or kind soever, he gave to his grand children and great grand children, in

fee. *Anne Hunter* was the only surviving child of the testator. The bill charged that the defendants had taken possession of the real estate, and of the deeds and muniments of title, &c. That the said pretended will, if ever made and published, was void in law, on account of the incompetency of the testator, who was not of sound mind and memory, at the time, and was under the improper restraint and influence of the defendants. The bill *prayed*, that the will might be decreed to be void, and be ordered to be delivered up and cancelled; that a trial at law might be had, under the directions of the Court, to ascertain the validity or invalidity of the will and codicil; that the defendants be let into the possession of their respective shares of the premises; and that the defendants be enjoined from committing waste, and account for the rents and profits, &c., and for general relief.

The answer, filed *January* 29, 1819, admitted the descent of the plaintiffs, as stated, the seisin of *Bennet*, and his death, and that the defendants had possessed themselves of the real estate, &c.; and alleged that they had good title to the same, under the last will and testament of *J. B.*, dated *January* 10, 1816, duly attested; and they averred that the testator was of sound mind and memory when he made the will and codicil, &c., and that the same are valid at law, and were not made under any restraint or improper influence, and that they were willing that the validity of the will should be tried in any manner the Court might direct.

A replication was filed, and proof taken as to the competency of the testator. Twenty-one witnesses were examined on the part of the plaintiff, and twenty-three on the part of the defendants. On the 1st of *December*, 1819, a decretal order was made, directing a *feigned issue* to be made and tried in the city of *New-York*, by a jury, to determine whether *J. B.* was of sound mind and memory at the date of the will, and competent to make the will and codicil, on

the trial of which issue the pleadings and the proofs taken in the cause were to be admitted in evidence. The feigned issue was tried at the *New-York* sittings, in *June*, 1820, before Mr. Justice *Yates;* and after a trial of eight days, the jury found a verdict for the defendants; and the judge *certified,* that the defendants examined twenty witnesses, whom he named, and read the deposisitions of seven witnesses who had been examined in chief in this Court, and that the plaintiffs had examined nineteen witnesses named by him, and read the depositions of five witnesses, who had been examined in chief in this Court; and that " the verdict was satisfactory to him." On the 26th of *June*, 1820, the N. P. Record of the feigned issue, with the judge's certificate endorsed thereon, were brought into this Court; and on motion of the counsel for the defendants, filed with the register. This Court continued its session, for four days, after the 26th of *June;* but no step was taken by the plaintiffs in the cause, nor were any proceedings had by them during the following *August* term. In the ensuing vacation, an order was obtained by the defendant's solicitor, to set down the cause for a final hearing in *October*, 1820, on the equity reserved. The cause was, accordingly, regularly brought to a hearing at that term, which commenced on the 23d of *October.*

*November* 9, 1820. *T. A. Emmet,* for the plaintiffs, moved for a new trial, on an *ex parte* statement of the evidence given at the trial of the feigned issue, furnished by him, and which accompanied the notice of the motion : and he also moved, that if it should be objected, that the evidence, so produced, was not duly authenticated, that a copy of the judge's minutes might be directed to be produced.

*Wells,* for the defendants, objected to the motion for a new trial, as being irregular, and too late. There had been,

he said, a delay of four days during *June* term, the whole of *August* term following, and of sixteen days during the *October* term, before the motion was made; and that no attempt had been made, on the part of the plaintiffs, during all that time, to have the case settled, nor had any application been made to the judge for a copy of his minutes. He cited 2 *Atk*. 378.

THE CHANCELLOR, for the reasons stated by the counsel for the defendants, denied the motion for a new trial.

The cause then came on for a final hearing on the equity reserved.

*Wells*, for the defendants, on the evidence taken in chief, the award of the feigned issue, and the judge's certificate, moved for a decree establishing the will of the testator, and that the plaintiffs pay the costs of the feigned issue.

*T. A. Emmet* and *Hoffman*, contra, contended, that in no instance had a second trial been refused, on an issue of *devisavit vel non*, where a verdict was found against the heirs; that the evidence taken in chief, which the counsel particularly examined and discussed, was very strong against the validity of the will; and that, at any rate, the Court would not affirm the verdict, without calling for the minutes of the judge as to the *parol* evidence given at the trial of the feigned issue. They cited 2 *Vesey*, 554. 2 *Vesey, jun.* 287. 4 *Vesey, jun.* 205. *Ambl.* 210. 2 *Vern.* 75. 378. *Dickens*, 500. 683. 7 *Br. P. C.* 149. 158. (2d ed.) 1 *Vesey*, 128. 3 *Atk.* 543. *Wyatt, P. R.* 263. 1 *Vern.* 293. 1 *Vesey*, 29. *Ambl.* 324. 3 *Atk.* 543. 2 *Vern.* 285. 1 *Phillimore*, 193, 194. 199, 200. 359. *Powell on Devises*, 146. 6 *Co. Rep.* 23.

*D. B. Ogden* and *Wells*, in reply, discussed the evidence

1821.

VAN ALST
v.
HUNTER.

taken in the cause, and stated the practice of the *English* Court of Chancery, as to granting new trials, in such cases. They cited *Wyatt,* 263.   1 *Vern.* 287.   1 *Vesey,* 28, 29. 3 *Atk.* 343.   *Ambl.* 324.   2 *Vesey,* 553.   2 *Vesey, jun.* 287.   4 *Vesey,* 205.   2 *Vern.* 378.   *Dickens,* 500. 683. 13 *Vesey,* 297.   4 *Bl. Comm.* 452.   *Dickens,* 576.   9 *Vesey,* 165. 52.   5 *Wheat. Rep.* 424.   2 *Atk.* 321.   7 *Bro. P. C.* 177. 145.

*Feb.* 13, 1821.

THE CHANCELLOR.   This was a bill filed by the heirs of *Jacob Bennet,* to set aside his will, as having been made, when by reason of his age and infirmity, he was not of competent mind and memory, or of having been procured by the undue influence of the defendants.   An issue was awarded, according to the practice of the Court in such cases, to try the question of the testator's competency, and the validity of the will.   The cause was tried at the *New-York* Sittings, in *June,* 1820, and after a trial which lasted eight days, and in which thirty-nine witnesses were examined, *viva voce,* and twelve depositions of witnesses not produced, were read, the verdict of the jury was in favour of the validity of the will.   The judge who presided at the trial, certified that the verdict was satisfactory to him, and no objection has been made to any proceeding or decision at the trial.

A motion for a second trial on a feigned issue, directed by this Court, to try the validity of a will, made the second term after the N. P. Record and certificate of the judge had been filed, on an *ex parte* statement of the evidence, was denied, on the ground of the delay, and the want of the proper documents.

The *nisi prius* record of the feigned issue and verdict, with the judge's certificate endorsed, was brought into this Court, and filed during the last *June* term, and four or five days before the end of the term.   During the *August* term, nothing was moved or done in the case, but the cause was regularly set down for hearing, on the part of the defendants, at the last *October* term, upon the equity reserved. The term commenced on the 23d of *October,* and on the 9th of *November,* the counsel for the plaintiffs moved for a new trial upon an *ex parte* statement of the testimony taken upon the trial, and furnished on their part, but with-

out any previous offer or attempt to settle a case between the parties, or any application or reference to the judge for his notes. The motion was consequently denied, by reason of the delay, and of the absence of every other document but the *ex parte* statement. The cause was then brought to a hearing upon the equity reserved, and a new trial was moved for, upon the ground of the testimony taken in chief in this Court, and which was substantially the same as that afterwards produced upon the trial of the feigned issue.

There can be no doubt of the regularity of the application for a new trial, at the hearing upon the equity reserved. It has been as often granted in that way, as upon a previous petition, or distinct motion for the purpose. To satisfy myself upon the merits of the case, I have not only read over the testimony taken in chief, but have also applied to the learned judge who presided at the Sittings, and have examined his notes, taken at the trial, and compared the testimony of the witnesses who were sworn at the trial, with the testimony of the same witnesses previously taken in this Court. There were also some witnesses examined at the trial, who had not been previously examined here, and particularly five witnesses on the part of the defendants, who gave material testimony in addition to what had been before furnished, in favour of the testator's competency. I have thus possessed myself of all the proof taken on the subject, both in this Court and upon the trial of the issue, and there is no affidavit or suggestion of the discovery of further testimony material to the case.

A new trial of a feigned issue may be granted, on a motion made for that purpose, at the final hearing, on the equity reserved.

The question then fairly presents itself: am I bound by the rules and practice of the Court, at all events, to grant a new trial, seeing that the verdict which has been taken, is against the heirs, and in favour of the will? Or, if a reasonable discretion is permitted to be exercised, is a new trial, under all the circumstances of this case, dictated by such discretion?

Though it is the most usual course to grant a second trial on a feigned issue, in cases affecting the inheritance, where the verdict is in favour of the will, and against the heir, yet it rests entirely in the discretion of the Court, to award a second trial or not, according to the circumstances and testimony in the case.

1. There can be no doubt of its being the more usual course in the *English* Chancery to grant a second trial, in favour of the heir, and out of regard to the inheritance, which is greatly respected, and peculiarly guarded by the policy of the law. But I have not been able to discover any absolute and inflexible rule in favour of such second trial. Though the Court generally grants a second trial, in cases touching the inheritance, before it concludes the heir, yet this is not always the case, and there are precedents both ways. The latest case on the subject, is that of *White* v. *Wilson*, (13 *Vesey*, 87.) which came before Lord *Erskine*, in 1806. In that case, the devisees filed the bill, to have a will established and the trusts carried into execution. An issue, *devisavit vel non*, was granted at the instance of the heir at law, suggesting incompetency in the testator. Upon the trial of the issue in the K. B., a verdict was found in favour of the will. A motion was made on the part of the heir for a new trial, upon a suggestion of the expectation of further evidence; and that if directions were to be given upon this verdict, the effect would be a perpetual injunction, and the right never could be bound by a single ejectment. The Lord Chancellor declared, " That he should be very sorry to find a rule in the Court, that there must be a second trial of an issue, if desired, without any ground laid for it. The inclination of Courts of Justice is against permitting parties to beat up for evidence; especially in a case of fact, mixed with opinion. No affidavit is produced, giving the reason to expect further evidence capable of shaking the verdict." The new trial was accordingly denied; and when the cause was decided upon the equity reserved, the Chancellor gave no costs on either side, as to the trial of the issue, but ordered the heirs at law to pay the costs of the motion for a new trial, and gave them their costs of the suit.

This is a stronger case than if the heir had filed the bill; for here the heir was called into a Court of Equity, and did not voluntarily desert his privilege at law of trying the

question in ejectment, where a verdict does not conclude him. The heir has no right to come here, as of course, and have an issue substituted in the place of an ejectment; for a Court of Equity is not the proper jurisdiction to try the validity of a will. When an issue has been directed, on the bill of the heir at law, it has been, according to what was said by the Master of the Rolls, in *Jones* v. *Jones*, (3 *Merivale*, 161.) in cases, where no opposition has been made to that mode of proceeding. It has been understood to be settled, since the case of *Kerrich* v. *Bransby*, (3 *Bro. P. C.* 358.) decided on appeal, in 1727, that the validity of a will must be determined upon a trial at law. (See also 9 *Mod.* 90. *Dawson* v. *Chater.*) If the heir will abandon his remedy, by ejectment at law, and come here by bill, for an issue, (which has sometimes been termed an ejectment bill,) he must content himself to take his remedy here, under the doctrine of the Court, that a right may be considered as determined, with a view to a perpetual injunction, by one trial at law, *if such issue be sent out of this Court for that purpose.* This was the doctrine as declared by Lord *Thurlow*, in *Robinson* v. *Lord Byron;* (2 *Cox,* 4.) and it had formerly received illustration and sanction, on appeal, in parliament, in the case of *Lomax* v. *Ryder.* ( 2 *Bro. P. C.* 258.) In that case, an issue was awarded in Chancery, to try a question, as to what was freehold and what was copyhold land, and a new trial was afterwards moved for in Chancery, and denied. An appeal was carried to the House of Lords, and it was contended, that as the appellant's inheritance was concerned, it ought not to be bound by one trial, when he was at liberty to try his right in ejectment as often as he pleased.—That if he could not obtain a new trial, he would be for ever barred of his right, being restrained by the Court of Chancery from bringing any action at law to assert the same; and that by the rules and practice of the Court, in the case of an inheritance, a new trial was very rarely, if ever denied. To this it was answered, that the appellant had

elected to take his remedy in equity, and not by ejectment. That the reason why, in ejectment, one trial does not bind the inheritance, is not from any rule or maxim of law, that one trial cannot conclude the right; for in proper actions that may be done, but from the peculiar nature of an ejectment, in which no judgment as to the inheritance, can be given.

The reasoning on the part of the respondent was sanctioned by the affirmance of the decree.

In the case of *Salter* v. *Hite*, (7 *Bro. P. C.* 208.) the devisees filed their bill, to establish a will; and the heir at law thereupon filed a cross bill, praying for an issue at law, to try the validity of the will. After the cause was at issue in chancery, several witnesses, were examined on both sides, and an issue awarded. The trial of the issue at the assizes, lasted fourteen hours, and a great number of witnesses, were examined, for and against the will, who spoke nearly to the same effect, as they had before deposed to, upon their examination in chancery. The verdict of the jury was in favour of the will; and in consequence of it, and of the great contrariety in the evidence, a new trial was moved for, and largely discussed; but Lord Chancellor *Bathurst*, in 1771, denied the motion, and declared, that both himself and the Judge who tried the cause, were satisfied with the verdict.

From this order, the heir at law appealed, and his very able counsel (Sir *J. Mansfield*, and Sergeant *Glynn*,) never pretended to claim, as a matter of right, that a second trial was to be granted, without having regard to the merits of the verdict. They only observed, " that Courts of Equity had often directed new trials in suspicious cases, where fraud or forgery was imputed to a will, and the verdict had not been satisfactory." They relied on the fact that the evidence clearly preponderated in favour of the heir, and that the evidence in support of the will was absurd, inconsistent, and contradictory, and, in short, that the facts given in evi-

dence were exceedingly complicated, and inconsistent with each other; and that on a new trial certain books which were material and wanting, might be produced. The order denying a new trial was reversed, and a new trial awarded; and on the second trial, which lasted eighteen hours, and in which the evidence was very contradictory and the circumstances complicated, the verdict was against the will, and another trial was then ordered by the Lord Chancellor. Upon this second order there was, also, an appeal, and this order was reversed, and the second verdict established. But it is to be observed, that the testimony on the second trial was very essentially varied, so as to render the verdict the result of different evidence; and it was declared upon the discussion on the last appeal before the Lords, that the Lords, in directing a new trial on the first appeal, acted upon the suspicious which they entertained as to the truth of the testimony in support of the will, and on the ground that the first verdict was not satisfactory upon the evidence.

This case may be cited as perfectly decisive of the question, and it proves, demonstrably, that there is no absolute and invariable rule of equity, that two successive verdicts are indispensable to establish a will. Such a rule would be most unreasonable and absurd. Lord *Bathurst*, in this case, refused a second trial; and when the Lords reversed the order, and granted a new trial, the counsel and the Court put it upon the ordinary and true ground for granting new trials, that the verdict was not satisfactory and was against the weight of evidence. The new trial was not the result of any arbitrary and fixed rule, for that would have precluded all discussion, but it proceeded from the application of a sound discretion to the special case. Lord *Hardwicke* has frequently declared, to the same effect, his sense of the rule for granting new trials, even where the inheritance was concerned. Thus he observed in *Stace* v. *Mabbot*, (2 *Vesey*, 553.) that the Court would direct a new trial, for further satisfaction in cases of feigned issues, if upon " any mate-

1821.

Van Alst
v.
Hunter.

rial and weighty reason," the verdict did not satisfy the Court; and that this was known to be the ordinary rule where a matter of inheritance was in question, " if any sort of objection arises to the trial." And he observed again, in *Cleeve* v. *Gascoigne* (*Amb.* 323.) that the Court " has frequently granted new trials, merely because the inheritance was to be bound." In *Baker* v. *Hart*, (1 *Vesey*, 28.) as reported in *Vesey*, Lord *Hardwicke* declared, that " in doubtful questions relating to inheritance, a Court of Equity frequently grants a new trial, without setting aside the former verdict, which is of great consequence to the parties, for then it may be given in evidence, though not conclusive." But, he further observed, that, " it had never prevailed as a general rule, though it was a matter of inheritance, *but according to the circumstances of the case*." The most that can be said on the subject is, that the Court will more readily, and on slighter grounds, grant a new trial in favour of the heir, when the first verdict goes to establish the will, than in other cases, where a feigned issue has been tried. The cases which have been, or which may be referred to on the question, prove this point, and they prove nothing more.

2. We are next led to look into the testimony in this case, and to determine whether, under all the circumstances, it be expedient and proper, that there should be a new trial.

*Extreme old age does not, of itself, disqualify a person from making a will.*

The testator was between 90 and 100 years of age, when he made his will, but it is well understood that age alone will not disqualify a person from making a will, provided he has a competent possession of his mental faculties. " A man may freely make his testament, how old soever he may be, for it is not the integrity of the body, but of the mind that is requisite in testaments." (*Swinb. part 2. sec. 5.*) This has been the doctrine of law in every age. *Senium quidem œtatis vel œgritudinem corporis sinceritatem mentis tenentium, testamenti factionem certum est non auferre.* (*Code, 6. 22. 3.*) *Sola, ac perse, senectus donationem testamentum aut*

*transactionem non vitiat.* (*Code* 8. 54. 16. *note* 62.) The law looks only to the competency of the understanding; and neither age, nor sickness, nor extreme distress or debility of body will affect the capacity to make a will, if sufficient intelligence remains. *Voet*, in his Commentaries on the Pandects, (*Lib.* 28. *tit.* 1. *sec.* 36.) expresses himself on this point in the strongest and most emphatical language: *licet enim non sani tantum, sed et in agone mortis positi, seminece ac balbutiente lingua voluntatem promentes, recta testamenta condant, si modo, mente adhuc valeant.*

Nor does the will, in the present case, upon its own intrinsic merits, betray a want of competent mental powers in the testator. He lived to witness three generations descended from his loins, and he had but one child left in the first degree and this was his daughter, Mrs. *Hunter*, who undoubtedly felt the force of filial love and gratitude much more strongly and vividly than the remoter generations. The affections, and consequently the kindness and attention of the descendants naturally grow more languid as the generations recede from the common ancestor. It was she, who alone survived to nurse him with a daughter's care, and " to rock the cradle of reposing age." He had also been, for sixty years, a man of domestic and retired habits. and during all that time, almost wholly confined to his farm, on which he died, and which he had cultivated and guarded with care and attachment. Nothing was more natural and agreeable to the course of the affections, than that he should cherish a wish which he so often declared, to have that *homestead* (as it is termed in his will) preserved entire for his daughter, and not sold or parcelled out among twenty or thirty distant descendants. He, therefore, devised this homestead, with the stock upon it, to his daughter and her husband, and charged it with a legacy of 1700 dollars to a particular grandson who lived with him. The residue of his estate he distributed equally among a numerous progeny of grand and great grand children; and I should feel reluctant, without pretty strong

1821.

VAN ALST
v.
HUNTER.

It is sufficient if the testator possesses a competent understanding.

proof of incapacity, to disturb a will replete with so much just feeling and rational calculation.

It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means which he has in protracted life, to command the attentions due to his infirmities. The will of such an aged man, ought to be regarded with great tenderness, when it appears not to have been procured by fraudulent arts, but contains those very dispositions which the circumstances of his situation, and the course of the natural affections, dictated.

There is no ground whatever in this case for the imputation of fraud or unfair practices, in the procuring of this will. The manner in which this will was read over to the testator, and corrected, and executed, and the reputation of the person by whom it was drawn, and the character and knowledge of the subscribing witnesses, have satisfied me, that it was fairly executed. The whole case resolves itself into one simple question of fact, whether the testator, by reason of age, had, or had not, lost his sound disposing mind and memory?

It is worthy of observation, that not a single act of folly or imbecility is imputed by any of the witnesses to the testator. The witnesses, on one side, represent his memory as gone, and that he was always of weak understanding, and quite illiterate; and they then give their opinion, that he was not competent to make a will. The witnesses on the other side, represent him as a man of remarkable activity and memory for his age; and they give numerous instances of his vigilant and sharp attention to his property. I cannot perceive that a single foolish act or saying has been imputed to him. And all the proof of mental imbecility seems to have been inferred from his loss of memory, except it be, perhaps,

in the case of a conversation with a clergyman on the subject of religion. The weight of testimony, from the proofs taken in chief, appears to me to be decidedly in favour of the requisite competency of mind; and that preponderancy of testimony is increased by the facts detailed by the five new witnesses, who were examined at the trial on the part of the defendants. The failure of memory is not sufficient to create the incapacity, unless it be quite total, or extend to his immediate family and property. The Roman law (*Code* 6. 24. 14. *and note 55.*) seemed to apply the incapacity only to an extreme failure of memory, as for a man to forget his own name—*fatuus præsumitur qui in proprio nomine errat.* There was no defect of memory, in this case, in respect to any thing very essential; and the witnesses give many instances of a strong and correct memory in the testator. The want of recollection of names is one of the earliest symptoms of a decay of the memory; but this failure may exist to a very great degree, and yet " the solid power of understanding" remain.

There does not appear to me to be any just ground for a new trial. There is no new light to be thrown on the subject by further proof; and I am more satisfied with this verdict than I should have been, if it had been on the other side. If a second trial was to be had, and a verdict found the other way, it would seem almost to follow of course (assuming the fact that the verdict was found upon the same testimony) that a third trial must be awarded, in order to turn the scale. The property and the parties would probably be, by that time, nearly exhausted by such very expensive and distressing litigation; and I do not see that such a result would promote either the ends or the reputation of the administration of justice.

I shall, accordingly, deny the motion for a new trial, and shall hold the plaintiffs concluded by the verdict, from contesting at law, the title of the defendants under the will, and shall enjoin them perpetually from proceeding at law, to

1821.

Van Alst
v
Hunter.

question that title. No costs are awarded to either party as ag inst the other.

The following decree was entered :—

"It is declared, that there is not any rule in equity, rerequiring two verdicts upon one or more feigned issues in favour of the validity of a will, before this Court can establish the same as against the heirs at law ; and that the awarding of a second trial after a verdict in favour of the will has been found upon a feigned issue directed out of this Court, rests entirely in discretion, to be governed by the circumstances and testimony appearing in the case. And it is further declared, that the verdict upon the feigned issue in this case does not appear to be against the weight of evidence, either in respect to the sound disposing mind and memory of the testator, at the time of the execution of the will, or the integrity with which the will was procured and executed. It is thereupon ordered, &c., that a perpetual injunction be awarded to stay any ejectment or other action at law of the plaintiffs, or either of them, and of all persons claiming under them against the defendants, or either of them, and all persons claiming under them, upon any claim or alleged title, as heirs at law of *Jacob Bennet*, deceased, against the claim and title of the defendants, under the will in the pleadings mentioned of the said *Jacob Bennet*. And it is further ordered, &c., that no costs of this suit be taxed by either party as against the other."