FRANCES A. HALL, appellant,

*vs.*

ARTHUR C. PERRY.

Knox.　　Opinion May 14, 1895.

87  569
88  435

87  569
96  164

87  569
99  398

87  569
f102  88
f102  239

*Will.　Testamentary Capacity.　Evidence.　Expert.*

To establish a will, contested on the ground of the want of testamentary capacity it must appear that the testatrix was a person of "sound and disposing mind;" that she had mental capacity sufficient to enable her to understand the business in which she was engaged. A "disposing mind" involves the exercise of so much mind and memory as would enable a person to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds. It exists when the testator can recall the general nature, conditions and extent of his property, and his relations to those to whom he gives as well as to those from whom he withholds his bounty. There must be active memory enough to bring to mind the nature and particulars of the business to be transacted, and mental power enough to appreciate them and form some rational judgment in relation to them.

But mere intellectual feebleness must be distingushed from unsoundness of mind. A person may be incapacitated by age and failing memory from engaging in complex and intricate business, and yet be able to give simple directions for the disposition of property by will. Great age may raise doubt of capacity so far as to excite the vigilance of the court, but it not only does not constitute testamentary disqualification, but rather calls for the protection and aid of the court to further its wishes. The control which the law still gives to a man over the disposal of his property is one of the most efficient means which he has in protracted life to command the attention due his infirmities.

In this case a woman, seventy-eight years of age, made a will giving her homestead to her adopted son. The will was contested by her daughter and only child. *Held,* that after a careful examination of all the evidence, it is the opinion of the court that the mental capacity of the testatrix was not devoid of any element requisite to make a valid will. The internal evidence afforded by the will itself is not only no impeachment of her testamentary capacity, but rather a confirmation of it. The leading provision of the will in which she gives the homestead to her " adopted son " appears to have been in conformity with a desire which she had long cherished, and a purpose which she had declared, long before the execution of the will. She may have been childish, changeable, impatient and sometimes inconsiderate; her judgment in relation to the value of property may not have been the most reliable and her mind may not have been vigorous enough to grasp all the features of a complicated transaction; but all this may be said of multitudes of elderly people whose competency to manage simple and ordinary kinds of business is never questioned by their acquaintances.

It is proper for the family physician to express an opinion upon the actual condition of his patient's mind, but not competent for him to give an opinion upon the direct question of her capacity to make a will. An expert should not be required thus to invade the province of the court and jury. Capacity to make a will, or what in any case shall be the standard of legal capacity, is a question of law. .

ON REPORT.

The case appears in the opinion.

*C. E. and A. S. Littlefield*, for appellant.

*A. A. Beaton and R. R. Ulmer*, for appellee.

SITTING: PETERS, C. J., WALTON, EMERY, HASKELL, WHITEHOUSE, WISWELL, JJ.

WHITEHOUSE, J. This is an appeal from the decree of a judge of probate approving and allowing the will of Margaret B. Perry, of the following tenor.

"Know all men by these presents, that I, Margaret B. Perry of Rockland, Knox County, Maine, being weak in body but of sound and perfect mind and memory, do make, publish and declare this my last will and testament, and herein dispose of all my worldly estate in manner following, to wit :

"First : I order and direct my executor hereinafter named, to pay all my just debts and funeral charges, as soon as may be after my decease.

"Second : I give and devise to my adopted son, Arthur C. Perry, for, and during the term of his natural life, the homestead upon which I now live, situate on Ocean street, in the city of Rockland, Maine, to have and to hold the same to him and his assigns, with all the appurtenances thereto belonging, for and during the term aforesaid. And I request the said Arthur C. Perry, if ever disposed to sell his right in the house and lot aforesaid, to give the first refusal of the same to my daughter, Mrs. Hezekiah Hall.

"Third : I give and bequeath to my daughter, Frank, wife of Hezekiah Hall, the sum of three hundred dollars. ($300.00.)

"I also give and bequeath to my said daughter, Frank, the furniture now in the parlor bed room, in my said house, together with the carpet now on the parlor floor of said house.

" Fourth :   I  give and  devise to my grand-daughter, Emma Perry, one  of  the children of  said Arthur C. Perry, the rever- sion of the said house and lot, hereinbefore devised  for  life  to said Arthur C. Perry.   My intention being that on the death of said  Arthur  C. Perry, that said house and  lot  shall go to  said Emma Perry, should she then be living.   If she should not  be living then I devise said reversion to the heirs of the said Arthur C. Perry.

" I also give and bequeath to the said Emma Perry the furniture now in the front chamber in my said house.

"Lastly :  I give, bequeath and devise to my  said adopted son, Arthur C. Perry, his heirs and assigns forever, all the rest, res- idue and  remainder  of  my  estate,  real,  personal  or  mixed, wherever found and however situated ; and I do hereby  appoint the said Arthur C. Perry, sole executor of this my last will and testament, hereby revoking all former wills by me made."

One  of  the  reasons originally assigned for  the  appeal,  was that  the  will  was the result of  undue influence on  the  part  of Arthur C. Perry, but it is not seriously urged that there is suf- ficient evidence to  establish  this ground of appeal as an inde- pendent proposition.

The  principal  contention now is that the testatrix was not of sound and  disposing mind at the time of  the  execution of  the will  admitted to probate.   This objection is also duly set forth in  the  reasons  of  appeal, and  the  question is now to be deter- mined by the law court, without the aid of a jury trial, upon the evidence adduced at the hearing before the judge of  probate, or so much thereof as may deemed legally admissible, with certain additional facts agreed upon by the parties and presented in the report as a part of  the evidence.

The burden is upon the proponent to prove that the testatrix, at the time of  the execution of the will, had  mental capacity requisite to  make  a valid will.   It is incumbent upon  him  to show that August 24, 1892, Margaret B. Perry was a " person of sound and disposing mind ; " that she had a mind sound enough properly to  devise  and  bequeath her property ; that  she  had

mental capacity sufficient to enable her to understand the business in which she was engaged when she made the will.

A "disposing mind" involves the exercise of so much mind and memory as would enable a person to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds; and a disposing memory exists when one can recall the general nature, condition and extent of his property, and his relations to those to whom he gives, and also to those from whom he excludes, his bounty. He must have active memory enough to bring to his mind the nature and particulars of the business to be transacted, and mental power enough to appreciate them and act with sense and judgment in regard to them. He must have sufficient capacity to comprehend the condition of his property, his relations to the persons who were or should have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relations to each other, and be able to form some rational judgment in relation to them. See *Robinson* v. *Adams*, 62 Maine, 369; *Barnes* v. *Barnes*, 66 Maine, 286; *Delafield* v. *Parish*, 25 N. Y. 9; 1 Red. on Wills, 121-135; Schouler on Wills, § 68.

But mere intellectual feebleness must be distinguished from unsoundness of mind. The requirement of a "sound and disposing mind" does not imply that the powers of the mind may not have been weakened or impaired by old age or bodily disease. A person may be incapacitated by age, and failing memory, from engaging in complex and intricate business, and incapable of understanding all parts of a contract, and yet be able to give simple directions for the disposition of property by will. Great age may raise doubt of capacity, so far as to excite the vigilance of the court, but it does not alone constitute testamentary disqualification. On the contrary, as stated in *Maverick* v. *Reynolds*, 2 Bradf. Sur. Rep. 360: "It calls for protection and aid to further its wishes, when a mind capable of acting rationally, and

a memory sufficient in essentials are shown to have existed, and the last will is in consonance with definite and long-settled intentions, is not unreasonable in its provisions, and has been executed with fairness."

When the mental capacity of Margaret B. Perry is subjected to these recognized and familiar tests, it is the opinion of the court, after a careful examination of the evidence reported and of the elaborate arguments of counsel, that it was not devoid of any element requisite to make a valid will. The internal evidence afforded by the will in question executed by her August 24, 1892, is not only no impeachment of her testamentary capacity, but rather a confirmation of it. The leading provision of the will in which she gives the homestead to her " adopted son," Arthur C. Perry, during his life, and the remainder to his daughter, whom she mentions as her "grand-daughter, Emma Perry," appears to have been in conformity with a desire which she had long cherished, and a purpose which she had explicitly declared long before the execution of the will. It is the uncontradicted testimony of two witnesses that, two years and a half before the will was made, she stated to them that she " intended for Arthur to have the house," and that it was her husband's wish that Arthur should have it when they were done with it. Nor is there anything in the evidence tending to show that the disposition of her property according to the terms of this will was unreasonable or unnatural. It nowhere appears that the " adopted son" was in any respect unworthy of the benefit bestowed upon him ; and it may properly be inferred from the evidence that, as her daughter, Mrs. Hall, was happily married and provided with a comfortable home, the testatrix considered her situation in life so fortunate as to place her beyond any need of her mother's bounty. The request that Mrs. Hall should have the refusal of Arthur's right in the house in the event of a sale, with the bequests to her of the parlor furniture and the sum of three hundred dollars, was a kindly remembrance, apparently evincing not only natural affection, but a sense of justice towards her daughter. And all the provisions of the will, examined without the aid of extrinsic evidence, would seem to indicate an active

memory on the part of the testatrix and a rational comprehension of the condition of her property and her relations to the bene-ficiaries named in the will.

The physical condition, manner of life and general conduct of the testatrix about the time of the execution of the will, and the particular circumstances attending it, all strengthen the pro-ponent's view of her testamentary capacity. True, the will was made less than four months before her death, when she was nearly seventy-eight years old, with some of the infirmities of age upon her; but she was then living in her own house, and was deemed capable of managing her own household affairs, receiving such kindly assistance as might be rendered from time to time by her daughter, who lived next door, and by the school teacher who boarded with her for two years immediately preceding her death. She appears to have visited the office of the attorney, who drew the will, two or three times before it was executed; but it was drawn in accordance with directions given by her two weeks before, and again read to her in presence of the subscrib-ing witnesses.

Two of these attesting witnesses give positive and unqualified testimony that they considered her of sound mind at that time, while the third, though not asked to state the opinion which he formed at that time, gives a circumstantial and detailed account of what transpired in his presence, from which it would appear that the conduct of the testatrix was entirely consistent, regu-lar and natural.

The testamentary capacity of the testatrix being presumptively established, the proponent rested; and thereupon the contestant introduced eight witnesses, including the daughter who contests the will, her husband, and her sister-in-law, the most of whom had been intimately acquainted with Mrs. Perry for many years, and all of them during the later years of her life.

They represent her, respectively, as childish, forgetful and subject to dizzy spells; or as impatient, inconsiderate and un-reasonable, as indicated by her urging Dr. Cole to hasten the removal of a sick niece from her house, by her exaggeration of the amount of labor she performed in her daughter's household,

and by her complaints that her aged sister, whose mind was very much impaired, "tired her all out ;" as changeable, forgetful and liable to have "peculiar ideas," as instanced by her belief that Arthur Perry was able to hire a place at a large rental ; as not sleeping well one night after talking with Arthur Perry ; or as excitable, and subject to headache and dizziness ; or as breaking down in consequence of the severe illness of her husband, eleven years before ; or again as growing more feeble, childish and weak-minded during the last year of her life, her mind failing with her body.    On cross-examination, however, one of these witnesses thought Mrs. Perry's condition was "about the same as other old ladies of her age."

The contestant, also, attaches great significance to the fact that, while there is in the will a bequest of "the sum of three hundred dollars" in favor of the daughter, in addition to the gift of the furniture in the parlor bedroom and of the parlor carpet, the schedule of assets appraised discloses a total value of one hundred and forty-one dollars and sixteen cents, of which only eleven dollars and sixty-six cents is money.    Two of the subscribing witnesses to the will received the impression that she had three hundred dollars in some bank, but it appears from the testimony of the contestant and her husband, Captain Hall, that although the personal property inventoried all came into the possession of Captain Hall, and was found in his hands after the death of Mrs. Perry, no money or other property was found anywhere except that named in the inventory.    It is, therefore, earnestly contended that Mrs. Perry was laboring under the delusion that she had three hundred dollars deposited in some bank, and attempted to bequeath that amount to her daughter, when in fact she was not possessed of a single dollar outside of the real estate devised to Arthur C. Perry and his daughter, valued at eight hundred dollars, and her household goods, and eleven dollars and sixty-six cents in money, appraised at one hundred and forty-one dollars and sixteen cents.    It appears that her taxes were abated, and that her only means of support were derived from a pension of twelve dollars a month during the later years, and eight dollars a month during the earlier years

following her husband's death, with such sums as she may have received from boarders; and while it does not seem from the evidence highly probable that she had three hundred dollars in money at the time of her death, it is not conclusively established that she did not have it at the time she made the will. Again, it is not an extraordinary hypothesis to assume that she greatly overestimated the value of her household furniture and other personal effects, and believed that at least three hundred dollars would be realized from the sale of these after the specific bequests to the daughter and Emma Perry had been set apart. The apparent inconsistency is susceptible of other plausible explanations; but the existence of the discrepancy is not so indubitable that it can safely be accepted as conclusive proof of an insane delusion; and, in any event, its significance would not be so strong that it might not be overcome by the great weight of other evidential facts and circumstances tending strongly the other way.

Nor do we think that the testimony of Dr. Estabrook, who was called as the family physician of the testatrix, and allowed to give his opinion as an expert respecting her competency to make a will, is entitled to the weight which the contestant would give it. It appears that he was not consulted by her professionally for more than a year prior to the execution of the will; but he states that "she has been a feeble woman, suffering from uterine trouble peculiar to women," and was "in a feeble condition of mind." When required in direct examination to state if she had "sufficient intelligence to make a will," he says: "I don't know as I can; I am not quite prepared for it coming in that shape;" and when pressed to answer, assuming her condition to be as he had described it, and that she had undertaken to dispose of property that she did not possess, he properly replied in substance that he did not understand "what the condition of a person's mind should be to be rendered competent to make a will." The learned counsel thereupon stated some of the principal requisites of testamentary capacity and the witness answered: "If she should give away somebody else's property, or property that was not her own, I should say she was not

competent." The counsel then said : "The question is, taking all these things into account, with your knowledge of her, her condition when you saw her, what the witnesses say of her loss of memory, her increased impatience, her treatment of her daughter, and her frequent dizziness, now, whether taking all those facts into account, she had such competency as I have described, and was capable of making a will?" Ans. "I think not."

It is plain, however, that if the element of "giving away property not her own," be eliminated, there are no facts stated by this witness in his description of Mrs. Perry's physical and mental condition, that will warrant his conclusion that she did not have mental capacity to make a will.

But though the witness was authorized as a family physician to express an opinion upon the actual condition of his patient's mind (*Fayette* v. *Chesterville*, 77 Maine, 28), it was not competent for him to give an opinion upon the direct question of Mrs. Perry's capacity to make a will. A question calling for a direct expression of opinion from an expert, whether a testator had "sufficient intelligence," or "mental capacity," or was "competent" to make a will, is not the appropriate form of inquiry, to elicit opinion evidence which will most satisfactorily enlighten and assist the court and jury in determining that issue. An expert should not be required thus to invade the province of the court and jury. What is sufficient capacity to make a will is not simply a question of fact; it is rather a conclusion which the law deduces from certain facts proved or admitted as premises. As stated by the court in *Fairchild* v. *Bascomb*, 35 Vt. 398 : "A witness may not correctly apprehend the rule of law, and if he uses such expressions, may be misled himself, or may mislead the jury. Hence the question should be framed so as to require him to state the measure of the testator's capacity in his own language, and by such ordinary terms or forms of expression as will best convey his own ideas of the matter ;" or to use the language of the court in *Crowell* v. *Kirk*, 3 Dev. 358, "to state the degree of intelligence or imbecility the best way he can." So in *Kempsey* v. *McGinnis*, 21 Mich. 123, the

court by Christiancy, J., use this language : "Capacity to make a will, or what in any case shall be the standard of legal capacity, is always a question of law. The physical or mental condition from which that capacity may be deduced, is a question of fact which may be shown by evidence of physical or mental manifestations, and the opinions of professional witnesses as inferences of fact thereon. There has been some looseness in the courts in permitting opinions to be given upon a testator's capacity, . . . but that mode of putting the question is objectionable."

In *May* v. *Bradlee*, 127 Mass. 414, it is said the court "might properly refuse to allow the question to be put in that form, because it called for an opinion upon a mixed question of law and fact, and not upon a question of medical science only. What degree of mental capacity is necessary to the making of a will is a question of law, which was not to be determined by the witness, and as to which he could not be assumed to be informed, unless the legal requisites of testamentary capacity were stated in the interrogatory, or otherwise explained to him." But it is obvious that even with such an explanation, incomplete as it would ordinarily be, when hastily given under such circumstances, a medical expert could not instantly grasp and fully appreciate, all of the legal requisites of testamentary capacity, and that form of inquiry would still be objectionable. The more simple and better form of inquiry "relates to mental soundness or unsoundness, with reference as near as may be, to the particular act or kind of act in dispute." Schouler on Wills, § 208. See also Lawson on Expert and Op. Ev. 137, Case IV.

But the proponent presents in rebuttal nine witnesses, neighbors and friends of Mrs. Perry, and with one exception all disinterested and not related to either of the parties.

Their combined testimony covers a period of nearly thirty years prior to her death, and comprises the condition, conduct and habits of life of Mrs. Perry in their varied relations with her of a business and social character during all this time. They discovered no material change in her appearance or manner, and no peculiarities in her conversation or conduct. One

witness set out blackberry bushes in her garden late in the fall after the will was made in August ; she waited upon him, "got the things" for him, and directed him how to perform the work, and he followed her directions.    None of them observed any-thing "particular" or "peculiar" in her habits not characteristic of other ladies of her age and experience in life.    She may have been more forgetful of the present than of the past, and may frequently have forgotten what she had just before said or done.    She may have been childish, changeable, impatient and sometimes inconsiderate ; her judgment in relation to the value of property may not have been the most reliable, and her mind may not have been vigorous enough to grasp all the features of a complicated transaction ; but all this may be said of multi-tudes of elderly people whose competency to manage simple and ordinary kinds of business is never questioned by their acquaintances and friends.    "Weakness of memory, vacillation of purpose, credulity and vagueness of thought, may all consist with adequate testamentary capacity under favorable circum-stances."    Schouler on Wills, § 70.    "It is one of the painful consequences of extreme old age," says Chancellor Kent, "that it ceases to excite interest, and is apt to be left solitary and neglected.    The control which the law still gives to a man over the disposal of his property is one of the most efficient means which he has in protracted life to command the attention due his infirmities."    *Van Alst* v. *Hunter*, 5 Johns. Ch. 148.

   *Appeal dismissed.    Decree of probate court affirmed.*