EMMA H. ROGERS, Appellant,

In the matter of the proposed will and codicil thereto of Lydia M. Deering.

Sagadahoc.    Opinion June 24, 1927.

*A codicil duly executed and a valid testamentary act operates as a republication of the will to which it refers, and the two are to be regarded as one instrument speaking from the date of the codicil.*

*If the codicil fail of probate the validity of the will is in issue.*

In the instant case both the will and codicil are offered for probate.   The burden is upon the proponents, therefore, to establish in the first instance that the codicil is a valid testamentary instrument, and failing so to do to prove the validity of the will.

The conclusion reached is that the weight of the evidence establishes that at the time the codicil was made, February 24, 1922, and at the time the will was made, February 16, 1922, the testatrix did not possess testamentary capacity, and therefore neither instrument is valid.

On appeal from a decree of Judge of Probate disallowing the will and codicil thereto of Lydia M. Deering.   The case was reported to the Law Court with a reservation limiting the issue to one of testamentary capacity.   Appeal dismissed.   Decree of Probate Court affirmed.

The case very fully appears in the opinion.

*Frank A. Morey and Edward W. Bridgham,* for appellant.

*Pattangall, Locke & Perkins and Walter S. Glidden,* for appellees.

SITTING: WILSON, C. J., PHILBROOK, DUNN, DEASY, STURGIS, BARNES, JJ.

STURGIS, J.    An appeal from decree of Judge of Probate, disapproving and disallowing instruments purporting to be the last will and a codicil thereto of Lydia M. Deering, late of Bath, deceased, the ground of disallowance being that the testatrix at the time the instruments were executed was not of sound mind as required by R. S., Chap. 79, Sec. 1.

The probate decree having been vacated by the appeal, the case was heard on new proofs and arguments in the Supreme Court of Probate, and there dismissed on the ground that the execution of the instruments in question was procured by undue influence.    On exceptions, this Court, in Rogers Appellant, 123 Maine, 459, held that the appellate decree was error, and the case then stood on the docket of the Supreme Court of Probate as an original appeal, the question of undue influence, upon the record as then made, decided.

Upon rehearing, further evidence was offered for and against the probate of the purported testamentary instruments, and by assent of the parties the case is now reported to the Law Court, with a reservation limiting the issue to one of testamentary capacity.

Precedent sanctions the report of this case.    Chandler Will Case, 102 Maine, 72.    It comes to us in the form of a transcript of evidence of approximately 1400 pages, accompanied by numerous exhibits. From this record, by the terms of the report, final decision of the question reserved is to be made upon the facts found in the legally competent and admissible evidence in the record submitted.

Lydia M. Deering died at Bath December 18, 1922, aged 84 years. On the 16th of February, 1922, ten months before her death, Mrs. Deering executed a will by which, after making bequests of $1,000 to each of her two sons, Harry G. Deering and Carroll A. Deering, she bequeathed the balance of her estate, amounting approximately to $40,000, to her daughter, Emma H. Rogers, naming Mrs. Rogers as executrix without bond.    Eight days later Mrs. Deering executed a waiver of the provisions of the will of her husband, Gardiner G. Deering, who had died testate in October, 1921, and having thus increased her share in her husband's estate from $2,000, the amount

of his bequest to her, to approximately $130,000,—a widow's third in this State,—Mrs. Deering immediately made a codicil to her will of February 16th by which she bequeathed the property thus acquired from her husband's estate in equal shares to her three children, Harry, Carroll and Emma.

Under our statute, R. S., Chap. 79, Sec. 1, as amended, the only standard of testamentary capacity is whether or not the testator, or, as in this case, the testatrix, was of sound mind at the times the alleged will and codicil were respectively executed; that is, did she at those particular times possess such soundness of mind as in the contemplation of the law enabled her to make a will or codicil, not the particular instruments in controversy. The question in each case is, had the testator or testatrix capacity to make a will? If of sound mind, he or she can make any will however complicated. If of unsound mind, no testamentary instrument however simple can be deemed a valid will. *Chandler Will Case*, 102 Maine, 72. *Delafield* v. *Parish*, 25 N. Y., 97.

In determining whether the mind of the maker of a will was a "sound mind" and therefore a "disposing mind", this Court, in *Hall* v. *Perry*, 87 Maine, at page 572, says: "A 'disposing mind' involves the exercise of so much mind and memory as would enable a person to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds; and a disposing memory exists when one can recall the general nature, condition and extent of his property, and his relations to those to whom he gives, and also to those from whom he excludes, his bounty. He must have active memory enough to bring to his mind the nature and particulars of the business to be transacted, and mental power enough to appreciate them and act with some sense and judgment in regard to them. He must have sufficient capacity to comprehend the condition of his property, his relations to the persons who were or should have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relations to each other, and be able to form some rational judgment in relation

to them." If the mind of the testatrix, Lydia M. Deering, meets these tests, she was of sound mind as required by the statute. If she did not possess these qualities of mind, she was not even in the weakest class of sound minds, but was a person of unsound mind.

The crucial question to be determined is the mental capacity of the testatrix at the respective times the two instruments offered for probate were executed. And as bearing upon this question, the testimony of the witnesses to the instruments, as well as that of other persons then present, has been supplemented by the bringing in of relatives, friends and neighbors, who recount from their recollection incidents, facts and conditions which they observed. The attending physician states his observations, and finally psychiatrists state their opinions with definition and classification of the testatrix' mental condition from a medical standpoint. It is not possible within the limits of this opinion to make a detailed analysis of all the evidence, nor by extended quotation to compare the relative values of conflicting evidence upon points in issue. And while we have examined and carefully considered the entire record and accompanying exhibits, we can but summarize in the statement of our findings and conclusions.

In early life Mrs. Deering was the usual prudent New England housewife, cooking, sewing, and performing all the usual household tasks which the average woman in similar circumstances found to do. She was a frail, slight woman, but active and industrious. Not a deeply religious woman, she nevertheless was a regular attendant at church, and for a time a member of the choir. Her social activities were not many, but she joined and participated in meetings of social organizations to which she belonged, travelled with her husband for short visits to Boston, New York and Washington, joined in luncheon parties at near-by inns and resorts, and called upon her neighbors and friends who in turn were frequent visitors in her home. In short, she was a normal, average woman.

In 1905 Mrs. Deering, being then about sixty-seven years of age, had become afflicted with a nervous trouble. She was inclined to be melancholy and in apparent mental distress, silently weeping without apparent or stated cause. Her condition was such that her husband engaged the services of a masseuse, and followed this treatment by sending her to a sanitarium in Melrose for a period of eleven weeks.

The history of her condition for the following years is not complete in the record, but from the testimony of those who came in contact with her it is apparent that her melancholy condition continued, her tendency to weep without apparent cause increased, and her physical well-being gradually grew less. About 1914 her husband sent her to Malden for a few weeks for Christian Science treatment, and it was not long after her return from there that a regular and permanent attendant was engaged as her constant companion. Weighing with care the testimony of the various witnesses, we are convinced that by 1918 Mrs. Deering had ceased to take an active part in the conduct or management of her household. With failing eyesight, she no longer read. She had laid aside finally her sewing and knitting. She had become averse to taking baths. At times she was reluctant to go to her meals, and only consented after much persuasion. Against her protest she was taken to ride by her husband in the automobile. Her time was spent generally in passive inactivity, sitting alone in her chair, except as she was coaxed to the piazza, taken to ride by her husband, or visited by family or friends. She had discontinued attendance upon church many years before. Her social activities, simple as they had been, had altogether been discontinued. At the time of the world war she was only slightly interested in the fact of its existence, its circumstances or its results. She did recognize relatives and friends, and occasionally entered into brief but intelligent conversation with them.

Her physical and mental deterioration progressively continued and increased during the next two years. All witnesses are in substantial accord that she continued to spend her days in inactivity with increased melancholy, weeping and wringing of hands. And while her replies are stated to have been responsive, it is evident that questions propounded to her were simple and her answers hardly more than simple assent or negation. She retained some memory with ability to recognize relatives, and call to mind old acquaintances when their identity was made known to her. In the fall of 1920 Mrs. Deering fell and fractured her hip. For weeks she was confined to the bed, but in the following spring recovered sufficiently to be about the house, moving with the aid of crutches or a cane and with the assistance of her attendant. Adding this unfortunate physical

injury and only partial recovery to the decline of the preceding years, Mrs. Deering was undoubtedly for her remaining days practically in a helpless physical condition.

It is difficult for witnesses to fix dates, and equally difficult in a judicial review of evidence to determine with precision the exact order of events, but in the testimony and inferences fairly to be drawn therefrom we find that at this period of her life Mrs. Deering was not only seriously crippled by her injury but also increasingly weakened in her mental capacity. She no longer expressed voluntary thought or desire in matters of household management. Her attendant was not only a constant companion, assisting her as she moved about, but also dressed and undressed her, and gave her baths as in the past, including the simple service of washing her face and hands. She was treated by her husband and attendant as incapable of self judgment or volition. She was not consulted in household affairs, and her wishes given little if any consideration. Her melancholy and depression were more constant, and her memory was becoming more impaired. In the midst of substantial prosperity which had come to her husband in his later years, poverty and want were her constant worry.

In October, 1921, her husband, Gardiner G. Deering, died. It is not clear how fully and completely Mrs. Deering realized the nature of his illness and the incidents of his passing. It does appear that she mourned his loss. And while she was in a state of mind in which illusions of her husband's continued existence mingled with a realization that he no longer lived, she had not reached a state of mental weakness which left her entirely insensible to the natural instincts of grief.

She and her husband had been living in the family homestead with a housekeeper and Mrs. Deering's attendant. After Mr. Deering's death, Mrs. Rogers, the only daughter, who lived near by, assumed direction and supervision of her mother's home and business affairs. She caused her name to be added to Mrs. Deering's deposits in the banks, and paid the bills of the house by her check drawn upon her mother's accounts. She wrote her mother's name in endorsement of such checks as came payable to the latter. Joining with her brothers, she discharged one of the servants and arranged that the other should act both as housekeeper and attendant for Mrs. Deering.

The automobile was sold and the chauffeur discharged.  There is no evidence to indicate that the surrender of her household management by Mrs. Deering in her husband's lifetime, or the supervision of it by her daughter after his death, was the result of request upon her part.  The inference is strong that it arose from a recognition by her husband and children, who knew her best, of her mental and physical inability to longer act in these matters.

Her family after her husband's death consisted of three sons, Frank, Harry and Carroll, and the daughter, Emma Rogers.  The sons continued the shipbuilding business founded by Mr. Deering, and all were on terms of closest love and affection with their mother.  Each had married, and their children were frequent callers upon the grandmother.  Apparently, with the exception of Mrs. Frank Deering, the wives of these sons enjoyed her love and confidence.  For reasons which are unimportant, Mrs. Frank Deering was *persona non grata* in the Deering family circle; and while this situation in no way minimized Mrs. Deering's affection for her son Frank, his children, because of their mother, were not in as high favor with their grandmother as were the other grandchildren of the family.

In February, 1922, Frank Deering, the eldest son, died, after a comparatively short illness.  His funeral was February 15th.  On the day following, through arrangements made by the daughter, Mrs. Rogers, and without the knowledge of the sons, Harry and Carroll, Mrs. Deering made a will.  She had previously in 1916 made a will by which her entire estate was given to her four children.  This will was in the possession of Mrs. Rogers.  Mr. Bridgham, local attorney, who had acted for Mrs. Rogers' husband in various matters, was called on the phone by Mrs. Rogers and summoned to the Deering homestead.  He came in the early afternoon, and his statement of what followed is substantially that he was practically a stranger to Mrs. Deering, having met her only once before.  He had been informed by Mrs. Rogers that a will was to be drafted, and after greeting Mrs. Deering asked her if she wanted to make a will or change her will.  He says she indicated assent but her exact words are not given.  He states that he then asked her where she wanted her property to go, and her answer was "that she wanted Carroll and Harry to have a thousand dollars each and the rest to go to Emma." He asked her if she wanted Emma to act as executrix, and she an-

swered yes. She assented in like manner to his question as to exempting Mrs. Rogers from giving sureties. He states that he was alone in the room with Mrs. Deering; that he wrote out the will, read it to Mrs. Deering, and inquired if it was her will and if she desired Mrs. Lermond and Miss Morse to join with him as witnesses, and received an affirmative reply. The witnesses were summoned and the instrument was signed and delivered to Mrs. Rogers, the daughter. He says that while there he asked if Mrs. Deering had made a previous will to which she made no reply, but Mrs. Rogers answered in the affirmative and produced the former will of 1919. Mr. Bridgham adds that he asked Mrs. Deering before the will was written out whether she wished to remember Frank's children and was answered in the negative. He says no mention of Frank's death was made. The other witnesses to the will, Mrs. Lermond and Miss Morse, substantiate Mr. Bridgham's statement of his conversations with Mrs. Deering, but add nothing to his account of her acts and utterances at that time.

The sons, Harry and Carroll, were not present when this will was made. The evidence leads us to conclude that they had no knowledge of its existence until some few days after it had been made, and had no information in advance that such action was to be taken by their mother. The will was deposited in her own vault by Mrs. Rogers and kept in her possession thereafter, and there is no credible evidence that the fact of its existence or its contents were ever thereafter mentioned by Mrs. Deering.

It is urged by the proponents that this will, bequeathing substantially the entire estate of Mrs. Deering to her daughter, Mrs. Rogers, was made in accord with a long cherished plan and with a definite purpose. Mrs. Rogers testifies that after her father's death and the reading of his will, which, giving only $2,000 to Mrs. Deering, divided his estate equally among his four children, she and Mrs. Deering learned for the first time that years before Mr. Deering had given to each of the boys substantial stock holdings in the G. G. Deering Company, a shipbuilding enterprise in which he and his sons were engaged. Frank and Harry received 308 shares each, and Carroll 208. Mrs. Deering received 16, but Mrs. Rogers had none. She says that her mother was much disturbed because the father had failed to include her in his stock distribution and felt that an injus-

tice had been done her. Her testimony is that her mother voluntarily in the late fall of 1921, or early winter of 1922, criticised the injustice of her late husband's distribution of the stock and of her own initiative suggested a gift of her entire property to the daughter. And Mrs. Rogers says that the making of this will on February 16th was at the request of her mother for the reasons and with the object stated. In corroboration of this explanation Mrs. Deering's housekeeper and attendant, Mellie Lermond, takes the stand and asserts that Mrs. Deering told her of the injustice which had been done the daughter and her desire to make amends therefor. The testimony of the witness, Mellie Lermond, indicates extreme bias and prejudice; it abounds in surmise and conjecture; and we are constrained to conclude that Mrs. Lermond has permitted her imagination, and impressions gained from reflection or discussion, to stand in many instances in the place of knowledge and truth.

Mrs. Rogers' statement of her mother's affirmative, voluntary discussion and consideration of the inequality of the daughter's share in her father's property does not accord with the condition of mind which the previous history of Mrs. Deering discloses. Reason compels the conclusion that at most Mrs. Deering acquiesced in any comments, suggestions or proposals advanced by the daughter. Mrs. Rogers is a deeply interested witness. Under this instrument she takes, to the exclusion of her living brothers, and the children of her deceased brother Frank, substantially the entire property of which her mother was possessed. It is upon her statement, corroborated only by the doubtful statement of Mellie Lermond, that the claim that the provisions of this will were in accord with previous purposes must rest, and her statement does not stand unrefuted. Her brother, Harry Deering, testifies that instead of the fact of the distribution of stock to the boys by the father being a matter of new knowledge after Mrs. Deering's death, in fact their entry into the business and their father's distribution of stock to them was at the time it occurred well known by all members of the family; and if we believe him, who is without marked interest in the sustaining of this will, the theory of cherished purpose advanced by Mrs. Rogers fails.

The testimony of the scrivener discloses that Mrs. Deering stated to whom she wanted her property to go, and excluded from her bounty the children of her son Frank. On the surface and standing alone,

these acts and statements would indicate that Mrs. Deering knew who were entitled to share in her bounty and made disposition of her estate accordingly; but in the light of her previous condition, her absolute dependency upon her husband in his lifetime, and after his death upon her daughter, the fact that she had not engaged in the simplest transaction of business for some time prior thereto except upon the suggestion and under the direction of others, that she had sunk into a state of passive acquiescence in the supervision and management of all her affairs, and exhibited resistance only in childish reluctance to the doing of the ordinary things of life,—"grave doubts remain unremoved" as to whether what she said and did on that 16th of February were the results of the exercise of the functions of a sound mind or in fact passive acquiescence in suggestions already made by others. This will signed by Mrs. Deering on February 16th was not delivered to her, but without disclosed request or suggestion on her part was handed to the daughter, Mrs. Rogers, who in the course of her testimony states that she placed it in her safety vault and kept it there until she produced it eight days later when the codicil which we are to consider was drawn and executed. The sons of the testatrix, Harry and Carroll Deering, say that while they learned later of the execution of the will, they were neither informed of nor did they make any inquiry as to its contents. It does not appear that Mrs. Deering afterwards had the instrument in her possession or at any time mentioned or discussed its execution, contents or effect.

It is evident, however, that the son, Harry Deering, was otherwise interested in his mother's testamentary affairs. He learned upon conference with an attorney that under the statute, R.S., Chap. 80, Sec. 13, Mrs. Deering could waive the provisions of her husband's will and take a third interest in his estate. The will of Mr. Deering bequeathed $2,000 to his widow, and divided the residue of his estate, amounting approximately to $400,000, equally among his four children, Frank, Harry, Carroll and Emma. As already appears Frank had died, and his children by right of representation were beneficiaries under the Gardiner Deering will in common with the then surviving sons and daughter.

Harry Deering testifies that a few days after February 16th he called on his mother and suggested to her that she waive her husband's will and take under the statute. He says she acquiesced in

his suggestion, although he admits that up to that time she had never indicated the slightest objection or criticism of the provisions of her husband's will of which she had knowledge.

Mrs. Rogers, the daughter, says that her brother Harry discussed the waiver of the father's will with her, and on February 24, 1922, she went to her deposit box and brought the will which her mother had made eight days before to the house, and again summoned Mr. Bridgham to act as scriviner of a new instrument. He came up that afternoon, and states that he found on his arrival Mrs. Deering, the daughter Mrs. Rogers, the housekeeper Mrs. Lermond, and the same neighbor Miss Moore who had acted as witness to the will of February 16th. Harry Deering came in shortly. Mr. Bridgham's testimony is:

"Q. What was said in regard to the business which it was desired that you should transact, prior to Harry arriving?

A. There was nothing mentioned until Harry arrived.

Q. Did you ask Mrs. Lydia Deering what she wanted of you?

A. No, I simply shook hands with her, said 'how do you do'.

Q. You knew that the business you had come on was for her, Emma had said that to you?

A. Yes, said her mother wanted to do some legal business.

Q. Did you ask her what she wanted of you?

A. Didn't make any talk except say 'how do you do' until Harry arrived.

Q. She didn't signify in any way what she wanted done?

A. I don't think she did.

Q. Now when Harry arrived he passed you a paper which was a waiver of the provisions of Gardiner Deering's will?

A. Yes.

Q. Harry said to you that his mother wanted to sign a waiver, didn't he?

A. Yes.

Q. She didn't say so?

A. No.

Q. Was that the first knowledge you had of the waiver, of her desire to sign, that came after Harry arrived and made his statement to you?

A. That is correct.

Q.  Then you asked Mrs. Deering if she did want to sign it?

A.  I did.

Q.  She said yes?

A.  Yes.

Q.  Did she say anything further in regard to the waiver or matters concerning the waiver excepting to answer your question when you asked her if she wanted to sign it, say yes?

A.  Yes, I explained to her what the waiver was and I think she said yes or something like that.

Q.  Do you recall her saying anything except yes—I mean do you recall her making any statement concerning the waiver any further than to assent when you explained to her about it?

A.  I don't recall any."

And again the scriviner testifies:

"Q.  Now after the waiver was signed did Mrs. Deering say anything in regard to the property that she would receive, the additional property that she would receive by reason of the waiver?

A.  She did not.

Q.  Did she indicate in any way that she understood that she would receive any other property by reason of the waiver?

A.  She said nothing in regard to it; she said nothing at that time.

Q.  Well, did she ever?

A.  She did when it came to the codicil, when I mentioned that.

Q.  Yes, she made a disposal of it in the codicil, told you how to dispose of it.  But after she signed the waiver you told her 'this gives you more under your husband's will than you had before' didn't you?

A.  I did.

Q.  And she said yes.

A.  I did.

Q.  And she said yes?

A.  She said 'yes, I know it."

In direct examination Mr. Bridgham says that after Mrs. Deering had signed the waiver he asked her if she wanted to add a codicil to her will and she said that she did.  He says that he asked her how she wanted to dispose of the property, and she said she wanted to give it to Carroll, Harry and Emma, and to his inquiry as to whether she wanted to divide it equally among them she said yes.  He states that he asked if she wanted to leave any of the property to the grand-

children and she said no.　He said he called her attention to the fact that her son Frank was now dead and asked her if she wanted to leave his children any of the property and quotes her as saying "No, I don't want to give them anything because they have enough" or "they have had enough."　He advised that the children of Frank Deering be mentioned by name in the provision excluding them from the benefits of the will,—asked their names, and the three were named by Mrs. Deering and the fourth by some one in the room.

In cross-examination Mr. Bridgham gives this significant testimony:

"Q.　And there was nothing in either conversation where she advanced a single suggestion of her own, was there?

A.　I don't know as she suggested anything unless I asked her in regard to the business.

Q.　Well, you have gone over the conversation fully, I don't want to rehearse it all again, but did she make any suggestion of her own on her own initiative that you recollect?

A.　Not that I remember.

Q.　Now was there any idea of any kind concerning any subject that she made the initial suggestion concerning?

A.　I don't know of anything she mentioned before I asked her the question."

Mr. Bridgham made inquiry as to what provision had been made for Mrs. Deering in Mr. Deering's will and he says she made no reply, but the daughter, Mrs. Rogers, or the son, Harry Deering, informed him that a bequest of $2,000 was contained in that will.

The codicil was written out in pencil, read to Mrs. Deering with the inquiry if it was as she wanted it, to which she replied "it was".　Mr. Bridgham then copied the document on the typewriter.　It was signed by Mrs. Deering and witnessed by Mr. Bridgham, the attendant Mrs. Lermond, and Miss Morse, all of whom had acted as witnesses to Mrs. Deering's will on February 16th.　As it was being attached to the will of February 16th which Mrs. Rogers had produced, Mrs. Deering asked what was being done, and upon being informed said, "Stick it on good and solid."

In so far as the record discloses, Mr. Bridgham's testimony accurately portrays the circumstances attending the execution of this codicil.　Those present at the time who testify add nothing of mater-

ial importance to his statements.   We have no doubt that the part Mrs. Deering took in this transaction was neither more nor less than the statements of Mr. Bridgham indicate.  She acquiesced in suggestions made, but of her own initiative expressed no wishes.   There is no convincing evidence that she grasped or comprehended the real effect of the waiver she signed whereby she diverted more than $130,-000 from the channels in which her husband's will directed his property to pass,—an acquisition of wealth of which she had no need, and which with the concurring execution of the codicil was primarily a benefit to the son and daughter who counselled and arranged the transaction.   We are unable to find in the incidents attending the execution of this waiver and codicil, including all evidence in the record bearing upon previous discussions between Mrs. Deering and her son Harry and daughter Emma, fact or inference fairly to be drawn which convincingly indicates that Mrs. Deering comprehended and held in her memory when she executed this codicil the nature, condition, and extent of the property of which she was making disposition.

Upon inquiry she did remember the names of three of her grandchildren;  she excluded her son Frank's children from her bounty; she stated to whom she wanted her property to go;  and she assented to the formal questions asked by the scriviner.   Standing alone these acts and utterances are consistent with and indicative of testamentary capacity;  but considered in the light of her previous and subsequent mental condition, and the active influences of her children which prompted and brought about the execution of the instrument, the probative value of these facts loses weight and fails to overcome the evidence of unsound mind lying elsewhere in the record.   The incidents attending the execution of this codicil but depict a continuation of the mental deterioration which had already taken place in this testatrix.

Mrs. Deering lived until the following December.   Her mental failure slowly but progressively increased.   She did attend a directors' meeting in April, 1922, as claimed by the proponents, but her son Carroll's testimony shows clearly that in casting a prepared ballot at that meeting she exercised no faculties of memory, reason or judgment, but only passively acquiesced in a pre-arranged program. The incident, we think, is without material significance.   Sometime

before July, 1922, she transferred her bank accounts to her daughter Emma, and at some time gave the latter corporate stocks of the value of $33,000 which she had received under the waiver of her husband's will. It is unnecessary to discuss these transfers further than to say that the testimony relating to them leaves little doubt that they were the result of the importunities of the daughter, Mrs. Rogers; and as in the sale of bank stock in the preceding January to the daughter's husband, Mrs. Deering in her acquiescence to the suggestions made to her gave no affirmative indication of the exercise of reason or judgment. If memory was there, it submitted passively to suggestions advanced.

In *Marsh* v. *Tyrrell*, 2 Flagg, 122, Sir John Nicholl said: "It is a great but not uncommon error to suppose that, because a person can understand a question put to him, and can give a rational answer to such question, he is of perfect sound mind, and is capable of making a will for any purpose whatever; whereas the rule of law, and it is the rule of common sense, is far otherwise: the competency of the mind must be judged of by the nature of the act to be done, from a consideration of all the circumstances of the case."

And in the Marquis of Winchester case, 6 R, 23 a, it is said: "By law it is not sufficient that the testator be of memory, when he makes his will, to answer familiar and usual questions; but he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason, and that is such a memory which the law calls sound and perfect memory."

Turning to the testimony of the medical experts, we find that in medical nomenclature and classification the medical expert for the contestants states as his opinion that Mrs. Deering was at the times in question suffering from senile dementia. On the other hand, the proponents offer expert opinion in denial of this conclusion which classifies the mental affliction of the testatrix as "involution melancholia". Without including in this opinion a discussion of the highly technical distinctions adduced in this conflict of opinion, it must be said, upon the facts as we find them in the record the opinions of both experts are consistent only with the conclusion that marked mental deterioration had taken place in Mrs. Deering and negative a finding that she was of sound mind when she signed the two instruments offered for probate.

The sole issue before us is testamentary capacity. The question of undue influence cannot be here considered. That question was passed upon by this Court in Rogers, Appellant, supra, on a substantially similar but nevertheless different record, and in this report is excluded by stipulations limiting the issue. In that opinion, however, this Court said: "Undue and improper influence presupposes testamentary capacity. Were there no capacity, there could be no will, and the question of whether or not there was influence would be an idle one. The strength of the person's will, in connection with other facts, may be material in relation to whether an exerted influence became operative, but total incapacity negatives the very suggestion of influence." With a finding of no undue influence, that case was remanded with the question of testamentary capacity undecided.

Evidence which would properly be considered in a determination of the question of undue influence appears with frequency in the pages of this record and in our discussion of the facts. We have not, however, considered it from that view point, but have weighed its materiality and probative value as bearing upon the voluntary, sound functioning of the testatrix' mind. A mind, acting of its own volition, forming its own judgments, exercising its own reasoning powers, and drawing its own conclusions, may be far different from a mind prompted by suggestion, directed by influence, or dominated by persuasion. In the latter, acquiescence may be mistaken for volition, repetition for memory, or assent for comprehension, and close scrutiny and searching care must be exercised that unsoundness does not remain undetected.

It is well said that the will of an aged person ought to be regarded with great tenderness when it appears not to have been procured by fraudulent acts. It is an equally sound and just rule that "a tender regard for the aged requires not only that their intelligent dispositions be upheld, but that their unintelligent ones, or wills not really their own, should be set aside."

In *Baker* v. *Butt*, 2 Moore, P. C., 317, Parke, B, said: "In a court of probate, where the *onus probandi* most undoubtedly lies upon the party propounding the will, if the conscience of the Judge, upon a careful and accurate consideration of all the evidence, on both sides, is not judicially satisfied that the paper in question

does contain the last will and testament of the deceased, the court is bound to pronounce its opinion, that the instrument is not entitled to probate."

In *Crowningshield* v. *Crowningshield*, 2 Gray (Mass.), 524, this rule is recognized, and it is there stated that a large proportion of wills are made when the mind is to some extent enfeebled by sickness or old age, and it is for this reason that the execution of the will and the proof of its execution are invested with solemnity; and it is held, "if, upon the whole evidence, it is left uncertain whether the testator was of sound mind or not, then it is left uncertain whether there was under the statute a person capable of making the will, and the will cannot be proved."

In *Delafield* v. *Parish*, 25 N. Y., 9, in the course of the opinion that Court adopts the rule above quoted from *Baker* v. *Butt*, and states that, "It is not the duty of the Court to strain after probate, nor in any case to grant it, where grave doubts remain unremoved and great difficulties oppose themselves to so doing."

Without adopting these statements of the rule, this Court is in accord to the extent that it holds that the burden of proof is upon the party propounding the will to establish its validity by a fair preponderance of the weight of the evidence. *Hall* v. *Perry*, 87 Maine, 569; *Robinson* v. *Adams*, 62 Maine, 369.

In the instant case both the will of February 16, 1922, and the codicil of February 24, 1922, are offered for probate. A codicil, if duly executed and a valid testamentary act, operates as a republication of the will to which it refers, and the two are to be regarded as one instrument, speaking from the date of the codicil. *Langdon* v. *Pickering*, 19 Maine, 214. If the codicil fail of probate, however, the validity of the will is in issue. The burden, therefore, is upon these proponents to establish, in the first instance, that the codicil is a valid testamentary instrument, and failing so to do, to prove the validity of the will.

Applying the rule of *onus probandi* of this Court to the facts found in the record, our final determination is that the weight of the evidence does not establish that Lydia M. Deering possessed testamentary capacity when on February 24, 1922, she made a codicil to her will, nor when on the previous February 16th she made the will itself, and that neither instrument is valid.

*Appeal dismissed. Decree of Probate Court that the instrument purporting to be the last will and testament, dated February 16, 1922, of Lydia M. Deering, late of Bath, in the County of Sagadahoc, deceased, and the codicil thereto, dated February 24, 1922, be disallowed, affirmed; ordered that the costs be charged against and paid out of the estate of Lydia M. Deering by her personal representative and charged in his account with said estate. Case remanded to the court below for further proceedings in accordance with this opinion.*