WILLIAM M. INGRAHAM, Guardian
Appellant from Decree of Judge of Probate
in re Will of ROBERT C. FOSTER.

Cumberland.    Opinion March 10, 1919.

*Wills.    General rule of law to be applied in the interpretation of R. S., Chap. 79, · Sec. 9.*

It is a presumption of the law, that the omission to provide for a child, or the issue of a deceased child, living when a will is made, is the result of forgetfulness, infirmity, or misapprehension, and not of design.    But this presumption is rebuttable.    With the wisdom or propriety of the act of the testator, in pretermitting his child from his will, the law has nothing to do.

That such omission was intentional, or was not occasioned by mistake, on the part of the testator, may be established by evidence extrinsical the will itself.    All the relevant facts and circumstances, including the intention of the testator as he declared it before, at, or after the making of the will, may be shown.

In the instant case, the proof is adequate and convincing, that, the child then being present to his mind, the testator, when the will was made, purposely dis-

inherited him. It, therefore, is conceived by the court to be its duty to sit aside and disregard the verdict of a jury otherwise advising. It is neither necessary nor desirable again to send the case to a jury. The mandate to the court below will be, that the omission of the appellant's ward from devise in the will of the ward's father, Robert C. Foster, was intentional, and not occasioned by mistake, on the part of the testator. The decree of the Probate Court denying that petition for the payment to appellant's ward of the same share of the estate of the testator, as he would have taken if no will had been made, is affirmed.

Motion for new trial after findings of jury on certain questions of fact submitted to them in the matter of the will of Robert C. Foster. Judgment in accordance with opinion.

Case stated in opinion.

*Augustus F. Moulton,* for appellant.

*Scott Wilson, and John B. Thomes,* for appellee.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, DUNN, MORRILL, JJ.

DUNN, J. Robert C. Foster, namesake of his father, distinguished from him as junior, and whose only prospective heir he was, is pertermitted from his father's will; a document executed when the child was less than five years old, and which became operative, before he had attained the age of eight years, by its probate in Cumberland County on May 4, 1916.

The question in this case is, whether exclusion of the boy from provision of that will was intentional, and not occasioned by mistake, on the part of the testator; a subject of investigation regarding which the will itself is silent.

At the outset, and without scrutiny, the disposition of the estate may seem to be unreasonable and unnatural, even to savor of unjustness; but, under the rule of law applicable, the maker of the will was not bound to have good or any reason for what he did, or if he had reason, to state it. With the wisdom or propriety of his act the law has nothing to do. If adequate and convincing proof, extrinsical the will, shall show, that when that instrument was made, the son being present to his mind, the parent purposely ignored him, and otherwise made bestowal of his bounty, then we must hold that the testator's will be done. *Whittemore* v. *Russell,* 80 Maine, 297; *Merrill* v. *Hayden,* 86 Maine, 133.

In natural and moral law is the basis of the relationship of parent and child. From this source flows the presumption, crystalized in a statute (R. S., Chap. 79, Sec. 9) harking back to the Province of Massachusetts Bay (12 William III, Chap. 7; Ancient Charters page 351), that the omission to provide for a child, or the issue of a deceased child, living when a will is made, is the result of forgetfulness, infirmity or misapprehension, and not of design. But the presumption is rebuttable. The statute adverted to reads: "A child, or the issue of a deceased child, not having any devise in the will, takes the share of the testator's estate, which he would have taken if no will had been made, unless it appears that such omission was intentional, or was not occasioned by mistake, or that such child or issue had a due proportion of the estate during the life of the testator." R. S., Chap. 79, Sec. 9. There is no pretence that Robert C. Foster, Jr., had befitting share of the estate in the lifetime of his father. The sole inquiry of the case is, to repeat, whether omission to provide for him in the will was intentional, and not occasioned by mistake, on the part of his immediate ancestor. The clause, "or was not occasioned by mistake," is introduced in the statute to enforce or give emphasis to the meaning of the preceding word, "intentional," which is the ruling expression. It is written in *Hurley* v. *O'Sullivan*, 137 Mass., at page 89, the word "mistake," as here used, is not to be construed as meaning such mistake "as would or might have caused the testator to entertain a different intention from that which omission from the will would show, but mistake or accident in the will or in its transcription." It must, in the context, refer to such mistake or mistakes as are likely accidentally to occur in the preparation of a will, as momentary rather than purposed forgetfulness, owing to the distress of the testator; or error, on the part of the scribe or otherwise, in reducing the testator's intention in that behalf to writing; and not to misapprehension or misunderstanding as to matters outside the will, whether of law or of fact. The statute does not state two contingencies in which omission from the will would work to deprive the child of his share, that is to say, an intentional omission, and also where, but for a mistake, the testator would not have done that which he intended to do, and actually did. On the contrary it states one and only one contingency. *Hurley* v. *O'Sullivan*, supra.

In its language the statute is broad enough to embrace all competent evidence tending to prove that such omission was intentional

and not occasioned by mistake. *Whittemore* v. *Russell*, 80 Maine, 297; *Merrill* v. *Hayden*, 86 Maine, 133. The evidential office of the will is to prove that the child is without devise under it. The inquiry as to whether he was omitted therefrom by design and without mistake, and not by blunder or oversight, arises under the statute. Seeking the testator's intention it is pertinent to inquire, consonantly with the law of evidence, concerning him and his son; the affection, or lack thereof, that subsisted between them; of the motives which may be supposed to have operated with the testator, and to have influenced him in the disposition of his property. All the relevant facts and circumstances, including the intention of the testator as he declared it before, at, or after the making of the will, may be shown. *Whittemore* v. *Russell*, supra; *Wilson* v. *Fosket*, 6 Met., 400.

What then of Robert C. Foster, the elder? Of his child and his relation to him, of his property, of its testamentary disposition, and of his intention, as he may have declared it, that concerning? Bred to the law, he came to the bar, and entered upon the practice of the profession at Portland, in partnership with his own father, but he did not especially actively concern himself with the business of the firm. In 1906 he married. The child first born of the marriage died in early infancy. In 1910 his wife left him, taking little Robert, not then two and one-half years old, and going to her girlhood home in Illinois. Efforts to bring about reconciliation between husband and wife, in which both the testator and his parents participated, the one by letters manifesting his better traits and characteristics, and importuning that she return to live with him, the others by personal interviews with the wife, after a journey afar for that purpose, were unavailing. A month after the dissociation, the Probate Court in Cumberland County granted the mother custody and care of the child, to continue throughout his minority. Three or four months later on, while Mr. Foster was absent in Europe, his wife, who previously had returned to Portland, removed her property and effects from what had been the family domicile. Within eight months from that time this court decreed the wife matrimonial divorcement. Promptly thereafter, for the consideration of five thousand dollars to her paid, she released to her former husband all her interest in his real and personal estate, and exempted him from all liability to provide for, or to contribute to, the support and education of their son, while he had been, and

should continue to be, in her custody.    Mrs. Foster thereupon permanently removed from Maine.    She settled in Illinois, and married again.

From the day that his wife left him until that of his death, Robert Foster never had opportunity to speak to his child.    The case ungrudingly concedes that, while the family lived together, he was an affectionate father, proud of his child, and ambitious for his future.    When the boy was taken elsewhere to live, the father's interest in him waned. For Christmas, twenty days from the day on which Robert's mother took her child away from the paternal home, he sent him five dollars, accompanied by a note couched in words of a parent's love.    On the third anniversary of the child's birth, in the next July  he sent him another present of money.    Beyond those gifts, after the separation, he gave him nothing.    He made no provision for him or his welfare, excepting the gross payment made to the mother at the time she assumed responsibility for the child's support.    Not altogether without foundation in fact, though not entirely based on truth, Mr. Foster was told that his son was known and called by the name of the step-father.    At once his attitude underwent decided change.    He abandoned effort to see the boy.    He gave away the toy bank in which for him it had been his habit to deposit dimes, assigning as a reason that he never expected again to see the child.    In the summer of the year of 1912, and once more in the summer of the very next year, the boy visited at the home of a maternal aunt, the site of whose house was a lot of land adjoining, and back of that on which was located the residence of Mr. Foster, in Portland.    His attention called to the fact that the lad was at play in the nearby yard, Mr. Foster came from out one room into another, and looked through a window at him.    What passed through his mind, and was reflected in his eyes, as he contemplated his son, was fleeting; but as he gazed he soliloquized, and she who, in other days, had been nurse to that child both in Maine and in Illinois, then, pausing in her housework, during the father's monologue, and herself looking at the boy in the yard, heard the parent say:    "They have treated me meanly, and I am through with them."    At another time he spoke to his friend and physician, Dr. Gray, already familiar with the estrangement, and told him of his formed intention, his considered and positive purpose, that his property should not go at his death to his former wife or to his child.

After the divorce had been granted, and his former wife had gone away from Maine, Mr. Foster remained in and about Portland. In April 1913, Foster's father, then stricken with the illness that was his last, sent for him, and when he had come, the father said: "Robert, I have made my will giving all my property to you, and your mother has made hers giving hers to you; now I want you to make yours, so that if anything should happen to you before it does to us that there won't any of your property go into that family (the family of Robert's former wife), but will come back into our family." And Robert said that he would. Less than a fortnight later, at the law office of the firm, in his father's absence, Robert Foster with his own hand wrote out his will, and then and there executed it. In his will he gave five hundred dollars to his housekeeper. The rest of his property, both real and personal, he devised and bequeathed to his father and mother, or to the one of them who should live longer than the other, omitting his child without mention. When he had signed and published the will, and it had been subscribed by the attesting witnesses, he took it to his father, and the latter put it with his own and Robert's mother's will, in the family safe in the father's home, where, always accessible to the maker, it remained until taken to the court for probate.

Robert C. Foster's property was not the fruit of his own industry. The house that he owned and occupied, and the personal property consisting, additionally to his household effects, of a few bonds and other evidences of indebtment, of which at the time of the divorcement he was possessed, were gifts to him from his parents. Two years later on, when his father died, the bulk of the father's property passed by will to Robert. He then abandoned the practice of the law; sold his dwelling-place, and went to live in an apartment house. He began the study of medicine. A policy of insurance on his life was cancelled for the reason, as he stated, that, as his mother, the beneficiary named in his will, already had ample estate of her own, there was no occasion to carry the contract, and the money requisite for premiums thereon might the more conveniently be used by him in defrayment of medical school expenses. At Christmas time in 1915, before his death in March next following, while at home through a recess of the medical school in which he was enrolled as a student, he talked with his mother respecting the disposal of his property in case she outlived him. He

told her of a person or two to whom, as expressive of his affection for them, he wished certain of it to be given; he said that he wanted some of it to go to Bowdoin College, of which he was a graduate. But in that solemn conversation, from its beginning to its end, when after the manner of mankind he must have scanned with telescopic vision both the present and the past, and have endeavored to peer into the mysterious economy of the future, the name of his child never was mentioned. Candid consideration of all the evidence in the case leads irresistibly to the conclusion, that soon after the entry of decree on her libel for divorce, and before the making of his will, . she who had been Robert C. Foster's wife, and with her the child born to them in wedlock, the disinherison of whom originated this case, together went out of that man's life forever. Afterward he exercised what was his undoubted legal right: he denied his property to him for whose presence on earth he was responsible. The weight of the burden of his executrix and principal beneficiary, herself going down life's steep declivity, would have been greatly lessened had he stated in his will, that touching the omission of devise to the boy he did what he designed to do. · Why he did not so say is conjectural. He may have thought all men would know without his saying. He may have forgotten that the silence of the grave is tongueless. Be that as it may, the conclusion of the court is, that the omission and failure on the part of Robert C. Foster to provide in his will for his only living child, was intentional, and not occasioned by mistake.

It is conceived by the court to be its duty to set aside and disregard the verdict of the jury. It is neither necessary nor desirable again to send the case to a jury. The mandate to the court below will be that the omission of the appellant's ward from devise in the will of the ward's father, Robert C. Foster, was intentional, and not occasioned by mistake, on the part of the testator. The decree of the Probate Court denying the petition for the payment to appellant's · ward of the same share of the estate of the testator, as he would have taken if no will had been made, is affirmed.

> *The case is remanded to the*
> *Supreme Court of Probate for*
> *decree accordingly.*