FRED D. MARTIN,

APPELLANT FROM DECREE OF JUDGE OF PROBATE.

Washington.     Opinion, June 17, 1935.

*Harold H. Murchie,* for Appellee.
*Herbert J. Dudley* and
*Oscar H. Dunbar,* for Appellant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, HUDSON, JJ.
BARNES, J. Dissenting.

DUNN, J. This case presents a contest over a will dated November 1, 1929, which purports to have been executed by John T. Martin, late of Calais. Mr. Martin died April 23, 1932, aged 83 years. He left no widow, but was survived by two children, a son and a daughter.

"Wills do not become operative until proved and established in some court having jurisdiction for that purpose—in this state, by allowance by the court of probate, or the appellate supreme court of probate. No other tribunal can give effect to a will." Strout, J., in *Cousens* v. *Advent Church*, 93 Me., 292, 45 A., 43. This clearly expresses the law respecting the operation and validity of wills.

The court of probate allowed the document in question as and for the last will of the decedent. Upon that, the son, as an heir at law, appealed to the Supreme Court of Probate. Such jurisdiction in probate is conferred by statute on the superior court. R. S., Chap. 75, Sec. 31.

On the appeal, all the reasons thereof save want of testamentary capacity were abandoned. With respect to that, there was much controversy, the discussion of which is left until later.

The issue of fact whether, when John T. Martin signed and published the writing, he was, within the requirement of the statute of wills, of sound mind, was submitted to the jury. That body, by its verdict, answered in the negative.

The proponent thereupon filed a motion to the Law Court to set aside the verdict as against law and evidence, and to grant a new trial. (In the interest of brevity, it is usual to call such a motion merely one for a new trial). Next, proponent moved, in the appellate court, for stay of final decree pending decision on the new trial motion; motion was granted.

Apparent confusion exists as to the course of procedure to bring a probate appeal from the Supreme Court of Probate to the Law Court. Neither rule of court nor legislation regulates the method. In recent years, especially, the practice has been by bill of exceptions, but the procedure adopted in the instant case is not a novel one.

The appeal for which the statute provides, from the original probate court to the higher probate court, brings up questions of

fact as well as of law. In the appellate court, questions of law may arise in the discussion and development of the case, to which exceptions are taken. An exception is designed as a warning for the protection of the court, that it may reconsider its ruling; and for the protection of the opposing counsel, that he may consent to a reversal. An additional object of the exception is to save the point to incorporate it into a bill of exceptions, which is the vehicle or medium conveying the case in purely legal aspect, to the reviewing court. For instance, exception might be noted to the admission of testimony, the rejection of evidence, principles of law as laid down by the presiding judge, exercise of discretion without authority, or findings of fact without evidence. A bill of exceptions would bring any such matter forward, on a strictly logical basis.

The practice has not, however, been uniform. In *Small* v. *Small*, 4 Me., 220, decided more than a century ago, the cause was heard on appeal. So, also, was *Rogers et al., Appellants*, 11 Me., 303. The case of *Halley* v. *Webster*, 21 Me., 461, recognizes motion for a new trial. In *Mayall, Appellant*, 29 Me., 474, the opinion begins: "This case comes before us by an appeal from the judge of probate." Like language is in *Cilley* v. *Cilley*, 34 Me., 162. In *Withee* v. *Rowe*, 45 Me., 571, motion for new trial was addressed to the appellate probate judge, who denied it, allowing exceptions. In *Robinson* v. *Adams*, 62 Me., 369, there were exceptions from instructions given, and from the refusal of instructions; also new trial motion. In *Barnes* v. *Barnes*, 66 Me., 286, again there was motion for new trial. *Carvill* v. *Carvill*, 73 Me., 136, came before the court on new trial motion. Such course of proceeding was challenged. There, as here, there had been a jury trial and a verdict adverse to the proponent. Judge Appleton, in delivering the opinion, says: "Whenever a jury trial is had, there may be a motion or exceptions for the correction of errors, whether of the court or jury."

In *McKenney* v. *Alvord*, 73 Me., 221, Barrows, J., writes: "We have no doubt of the power of this court to consider and pass upon the motion." Motion for a new trial appears to have been regarded as affording an opportunity for the correction of errors, with a minimum of expense and delay.

The cause assumes, says Judge Haskell, in *Backus* v. *Cheney*, 80

Me., 17, 12 A., 636, when issues are framed for a jury trial, the character of an action at law. The procedure is according to the course of the common law.

The opening words of the opinion in *Hall* v. *Perry*, 87 Me., 569, 33 A., 160, are: "This is an appeal . . ."

*Wells, Appellant*, 96 Me., 161, 51 A., 868, proceeds on the theory that where issue framed for the jury, simple motion to have the verdict set aside and a new trial granted, is suitable.

So are the cases, without detailing them further, until *Latham, Appellant*, 116 Me., 524, 102 A., 295.

There, after jury verdict, the appellate probate court disallowed the proffered document. "That decree," the per curiam opinion states: "appears to be in force, its validity not having been questioned by exceptions or otherwise. The practice in such a case should be, we think, for the party filing the motion for a new trial to move the court not to enter any final decree pending the motion for a new trial on the issues presented to the jury, and, should a decree be made notwithstanding that motion, then to take and prosecute exceptions to the making of such decree under the circumstances." On consideration of all the evidence, the motion was overruled. The court noted that the overruling of the motion had the effect of sustaining the decree of the appellate court.

In *Thompson, Appellant*, 118 Me., 114, 106 A., 526, the jury answered submitted questions. Counsel as to whose contentions the answers were adverse, interposed a new trial motion. No decree was entered. "As a matter of strict statutory construction," says Cornish, C. J., in disposing of a motion to dismiss the new trial motion, "it may well be doubted whether this course of procedure is correct; but in view of the fact that such a practice has been of long standing, a majority of the court do not feel compelled to dismiss the motion on this ground without considering the merits of the case. If the customary procedure is to be changed or modified, it had best be done by rule of court." Affirmation of the decree of the judge of probate was ordered.

Mr. Justice Spear, concurring, in an additional note, in the result, expressed himself of the opinion that a motion for a new trial on the verdict of a jury in a probate appeal was without effect; that the remedy should be exceptions.

In *Ingraham, Appellant,* 118 Me., 67, 105 A., 812, there was, after jury findings, motion for new trial. The Law Court, on reviewing the case, remanded it for the entry of a decree of indicated tenor.

*Rogers, Appellant,* 123 Me., 459, 123 A., 634, came up on exceptions.

In *Look, Appellant,* 129 Me., 359, 152 A., 84, after jury verdict, final decree was settled. Appellant excepted; he also filed a motion for a new trial. Exception sufficing purpose, the motion was without office.

*Hiltz, Appellant,* 130 Me., 243, 154 A., 645, was on exception to decree.

Against this background, there is room for honest differences of interpretation as to what should be formal practice. The decided cases come to this: In a will contest, technical rules of pleading, in reference to bringing the case to this court, have never been permitted to prevent the exercise of revisory power. No rule of court changing or modifying "customary procedure," (to recall the words of Judge Cornish in *Thompson, Appellant,* supra,) has ever been adopted; nor has the view advanced by Judge Spear for himself alone been announced as the view of the full court.

Moreover, what was done in the case at bar is suggested in *Latham, Appellant,* supra. It is true that the statements in that opinion are dicta, but as dicta they are not without significance.

Neither precedent, policy nor justice demands that other than legal rights, in distinguishment from those rules which the court may adjust for itself, should be controlling.

Ability to make a will depends upon mental competency. Wills, as has been seen, are denied effect until they have been publicly proven. A fair preponderance of the evidence must establish not only that the testator signed, but that he was of sound mind at the time of doing so. Absolute soundness of mind is not essential, but "sound mind" is a condition precedent to making and executing a valid will. The expression "sound mind" does not mean a perfectly balanced mind. The question of soundness is one of degree. One is sane when he is possessed of a mind which is not that of an imbecile and which is healthy. *Robinson* v. *Adams,* supra.

A person of statute age, who understands substantially the na-

ture of the act he is performing, has a knowledge without prompting of the extent of his property, his relations to others who might or ought to be the objects of his bounty, is aware of those to whom he is giving as well as those from whom he withholds it, of the scope and bearing of what he is doing, and has sufficient memory to collect and hold in his mind the elements of the business to be transacted, long enough to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them, has that sound mind which qualifies him to make a valid will. A testator may forget the existence of a part of his estate, or of some one who has natural claims upon him, and yet make a will. What is required is merely that he shall have such mind as to remember the necessary facts; not that he shall remember them all. He need not have the same perfect and complete understanding and appreciation of the matter involved as a person in vigorous health of body and mind would have, nor is he required to know the precise legal effect of every provision in his will. *Hall* v. *Perry*, supra; *Wells, Appellant*, supra.

Schouler says: "The true criterion is not whether the testator is capable of a particular transaction inter vivos, but whether he is capable of making a will. The comparison is not of different standpoints, rather that of different degrees from a common standpoint." *Schouler on Wills*, Sec. 67. See, too, *Page on Wills*, Sec. 140 et seq. There can be no safer rule than that the competency of the mind should be judged by the thing to be done on a consideration of all the circumstances of the case. The point is to comprehend the testamentary act. *Hall* v. *Perry*, supra; *Wells, Appellant*, supra.

The want of capacity, when urged as a ground for invalidating a testamentary act, must relate to the time of the act. Incompetency may exist before or after, and still the will be valid.

On the issue of competency to make a will, the burden of proof is upon the proponent. It is for him to substantiate soundness of mind, even though the contestants offer no evidence at all. This is because the right to make a will is neither a common-law nor a constitutional right, but one created by statute. *Hazard* v. *Bliss*, 43 R. I., 431, 113 A., 469; *Nelson* v. *Nelson*, 235 Ky., 189, 30 S. W., (2nd) 893; *In re Garland's Will*, 160 N. C., 555, 76 S. E.,

486; *Irwin* v. *Rogers,* 91 Wash., 284, 157 P., 690; *Vestal* v. *Pickering,* 125 Ore., 553, 267 P., 821; *Gibson* v. *Van Syckle,* 47 Mich., 439, 11 N. W., 261; *In re Evans' Will,* 193 Iowa, 1240, 188 N. W., 774; *Selden* v. *Illinois Trust & Savings Bank,* 239 Ill., 67, 87 N. E., 860; *Crowninshield* v. *Crowninshield,* 2 Gray, 524; *State* v. *Hamlin,* 86 Me., 495, 505, 30 A., 76.

The ultimate question is: Is this the last will of the testator? The appeal supersedes proof of the will in the court of probate.

In this class of cases, as in the great majority where the burden of proof depends upon the weight to be given to oral testimony, it rarely can be ruled as a matter of law that the burden has been sustained. Exceptional instances, where the facts do not raise a disputed question of fact, do not affect the general rule.

John T. Martin, as previously pointed out, was, on executing the will, eighty-one years old. Extreme old age is not of itself incapacitating. *American Board of Commissioners, etc., Appellants,* 102 Me., 72, 66 A., 215. The fact, however, is not, on the one hand, to be ignored; nor, on the other hand, to be deemed as casting any additional burden of proof upon the proponent.

Mr. Martin had been part owner and captain of different coasters.

On divorcing his wife, in the 80's, he married again. No children appear to have been born of the second union. When, or in what manner, that marriage was dissolved, does not appear.

In 1917 he left the sea. Thereafter he seems to have been chiefly concerned in renting his various houses.

Between father and children, especially when the father was sailing, and the children, in their minority, were living with their mother, association had not been close, but apparently he remembered them with affection toward the end of his life.

In 1927 or 1928, there is no dispute that Mr. Martin was physically "very feeble," "awful hard of hearing," and "mind failing." He was "forgetful" in a marked degree. He had, at some previous time, had a revolver, and at intervals would try to find it, and as testimony runs, have "spells," easily get "kind of excited . . . kind of insanity like," so that he alarmed those about him. Physical infirmity and mental soundness, it is common knowledge, may coexist. Not every weakness incident to the ravages of age and disease

unfits a man for making a will, nor is it true that a lack of testamentary capacity is any less fatal to the legal power to make a will because it is the result of these things. *Byrne* v. *Fulkerson*, 254 Mo., 97, 162 S. W., 171.

At various times, from 1927 on, so is testimony, testator's son stayed with him, at his invitation, assisting him in some of his rentals and collections, driving him about in his automobile, and advising him, to some extent, regarding his affairs, but seemingly to no particular avail.

In 1930, also at his request, his daughter came to see him. He acquainted her with his property, and asked her preference with respect to either of two dwelling houses; this she made known. She testifies he told her he would give her choice effect; there the matter ended.

In July, 1929, he made a will, devising certain real estate to his son, and bequeathing personalty to his daughter. The lawyer who prepared the instrument had previously transacted minor business and collected rents for the testator. October 25, 1929, testator executed another will, mentioning neither child. On the same day, he deeded a house and lot to the son.

Two days elapsing, he expressed dissatisfaction with the terms of the will. The attorney, while on the witness stand, said that he told Mr. Martin to "go home and think it over three or four days." On November 1, 1929, he returned to the lawyer's office, on the authority of the latter as a testifying witness, bearing a safety deposit box from a bank vault, "to see if there was money enough." Besides a municipal bond, a mortgage or two, and accounts receivable, the personal estate of Mr. Martin comprised two bank accounts, aggregating nine thousand dollars. The proposed money bequests, seventeen in all, totaled fifty-nine hundred dollars. The names of his children were not on the list; of the persons whose names were listed, five—two nephews, niece, grand-niece, and sister,—were kin to him. The gifts to them amount to twenty-two hundred dollars. Nothing shows the existence of blood relationship between testator and other legatees, or between him and the residuary devisee.

The son gives testimony that he accompanied his father to the lawyer's office; that his father said: "I am not fit to make a will,"

and that on his (son's) calling the lawyer's attention to the remark, reply was: "He is all right." The son says he later left, and still later returned; in his absence a will had been made. This, the lawyer, while on the witness stand, definitely denied; he says the son was not there that day. He also denied a further statement by the son, that he (lawyer) said to testator, after the will had been attested and the witnesses had gone: "This is your last one."

The will contained specific provisions, and a general residuary clause to dispose of all the testator's estate. The lawyer's evidence is that the instrument was, in certain respects, a reproduction of the one next preceding, though the former had fewer bequests. That the testator read the will, or that its contents were read and explained to him, does not appear.

Mr. Martin signed the document, in the presence of three credible and not beneficially interested persons, who had been asked into the office; they signed as witnesses and then retired. The will, it seems desirable to notice again, contained no internal evidence of the testator's mind and motive respecting his children. As to them, it was utterly silent.

The first witness to the will, on being shown her name, testified to having been called in, signing, the other two witnesses signing, and walking out. She adds her opinion that the testator was of sound mind. The opinion of subscribing witnesses as to the condition of the testator's mind at the time of the execution of his will, may be received in evidence. *Cilley* v. *Cilley*, supra; *Robinson* v. *Adams*, supra. This witness' words are: "He (testator) seemed very bright. I didn't think there was anything wrong with him." The gist of the testimony of the next witness is: "as far as I know" he was of sound mind. She says she formed no opinion at the time. The third witness substantiates his idea that testator "seemed to be all right," by saying: "he was in my place quite often and talked and conversed . . . we lived neighbors."

"The subscribing witnesses to a will may testify to their opinion of the testator's sanity, upon its being presented for probate, because that is one of the facts necessary to the validity of the will, which the law places them around the testator to attest and testify to." *Hastings* v. *Rider*, 99 Mass., 624.

The value of the testimony of the subscribing witness is to be

determined with reference to his opportunity for observation, his skill and care in observing, his intelligence, and powers of discernment and memory. *Thornton* v. *Thornton*, 39 Vt., 122.

Assuming, in the present case, that the testimony of the attesting witness is prima facie evidence of testamentary capacity, still it is only prima facie evidence of that fact. Of course, competency to will may be established by other sufficient evidence. The contestants introduced, as a witness, a former long-time business associate of the testator, his friend and neighbor, of about his age. He gives evidence that though the testator had been a capable, prudent man, yet in 1928 and 1929 he did not think consecutively, his speech was disconnected, during conversation "he would talk about something else and then turn right on to something far from it." Evidence tends to show that testator began to take less and less care of his estate; was "changeable" in his transactions; interested in trifles; his judgment was faulty. Infirmities of body and mind became more marked with the passing of the days; faculties were dimming.

Testimony of the son is that his father was whimsical, stubborn and morbidly irritable. It goes to prove that testator had a certain amount of memory and sense; also that he was an aged man, once well able to take care of himself, but doing and saying many things in an absurd way, forgetting events, at times "worrying," and at other times having "excited spells"; acting "as though he were insane." The witness was not expressing his opinion; this was merely his way of telling what he had noticed. A layman is not competent to give expert testimony; he is not at liberty to give his judgment as to the condition of the mind of the testator at the time he saw the acts of which he speaks; it is for him to describe the acts and appearances that he saw.

A merchant who rented a house of the testator attested to disturbances of speech, to apparent lack of memory of recent happenings, garrulousness, incoherence, and failure of powers of attention.

The testator's physician described the condition of his patient, professional attendance on whom, for prostatic trouble, began in 1928. Mentality was already impaired; a condition known as senile dementia—mental imbecility from old age—existed. "We might sup-

pose old age to be that part of life farthest removed from infancy, but here we see the circle of life closing in upon itself where it began." *Hiett* v. *Shull*, 36 W. Va., 563, 15 S. E., 146. This type of mental disorder "begins gradually, is progressive in character, and in its advanced stages, 'the brain is well-nigh stripped of its functions.' " *Byrne* v. *Fulkerson*, supra.

An attending or family physician's opinion as to the mental health of his patient is competent; such patient's condition some time before, and some time after, making the will is relevant, as tending to show the condition of mind when it was executed.

The doctor stated, on the stand, that late one afternoon in the summer of 1929, (that is, before the making of the will on November 1st,) testator, "in his shirt sleeves and an old battered straw hat," came to him, requesting the loan of two dollars, "as he was going to take a trip . . . was going to take the evening train" and go to Denver, Colorado. The medical witness expressed his opinion, founded upon personal observation, on the question of the testator's soundness of mind.

The study of the mind is difficult and complex. Its problem never has been, by man, and never will be, completely solved. A man may be medically insane and yet be capable of making a valid will. In the light of medical science, a man is either sane or insane. The law recognizes that between the full light of sanity and the eclipse of total insanity, there is a penumbra in which, although the mind of a person may be to some extent impaired by age or disease, still, if in reference to his ordinary business, he can exercise not only the intellectual faculty, but the volitive, his acts for all secular purposes will be of validity and force. The distinction was made clear to the witness. He answered, in effect, that the testator was not, at the time of making the will, of rationality to transact common and simple business, continuously and understandingly, compatibly with the intelligence belonging to the weakest class of efficient minds. He was not, in everyday phrase, in his "right mind."

There was no direct evidence that on the day and at the hour the will was signed, testator was not sane, but as has been said by another court, it does not follow that the proof of incapacity at the very moment must be made by eyewitnesses on that occasion. *Byrne* v. *Fulkerson*, supra. Proof, as here, of insanity prior thereto,

permanent in kind, and progressive, raises a presumption of continuity. *Halley* v. *Webster,* supra; *Weston* v. *Higgins,* 40 Me., 102. The presumption is of fact rather than of law.

The daughter testifies that when, in 1930, she visited her father, she remained two days. This was the occasion of her indicating, at his request, her preference as to houses. She witnesses as to facts indicative of the physical and mental weaknesses of her father. He had become, from her description, childish and forgetful; he was apathetic and indifferent to current events.

No person living in or near the home of the decedent, except one of the will-subscribing witnesses, contradicts the narrations of the witnesses for the contestants; or tells any other incident or act that forbids the impression legitimately drawn therefrom.

A jury does not figure, ordinarily, in a will contest. In a court of probate there is no jury. In the appellate court of probate, an issue of fact may be framed for the jury, but hearing is usually by the judge alone. The verdict of the jury upon an issue out of probate is only advisory and never conclusive upon the court; that is, the court may or may not regard it.

The conclusion of the reviewing court is that if the jury, on the whole case, chose to believe the evidence, as they apparently did, for the contestants, it would support the verdict.

Had John T. Martin sense and memory and will enough to do the thing done? is only one form of putting the implied question the case presents. The witnesses detail his age, appearance, conversation, ways, conduct,—as compared with an earlier period in his life, when the soundness of his mind was beyond question. Too much stress should not be laid on a comparison between the present and the past. The test is capacity for the object attempted.

The difficulty in deciding where testamentary ability ends is frequently great; yet each case must depend upon and be determined by its own evidentiary showing. There is, in this case, substantial evidence of the presence of senile dementia in a state so advanced as to justify saying, as a finding of fact, that the burden of proof as to soundness of mind, when the will was made, is not sustained. On that proposition, the preponderance of the evidence is not with the proponent; indeed, it is against him.

The decree of the Probate Court must be reversed. That this

may be done, and the will denied probate, the motion for a new trial is overruled, and the cause remanded to the Supreme Court of Probate, for the entry of decree accordingly. Costs may be allowed both parties, from the estate of the decedent.

*So ordered.*

BARNES, J. Dissenting.