JANE WALSH WANING, APPELLANT
FROM DECREE OF THE
HONORABLE NATHANIEL M. HASKELL, JUDGE OF PROBATE
OF THE COUNTY OF CUMBERLAND
ALLOWING THE WILL OF PATRICK M. SILKE,
DATED MAY 17, 1950

Cumberland.    Opinion, October 14, 1955.

*Richard E. Poulos,* for contestants.

*John Bates,*
*Devine, Devine & Devine,* for proponents.

SITTING: FELLOWS, C. J., WILLIAMSON, WEBBER, BELIVEAU, JJ., THAXTER, A.R.J. TAPLEY, J., and CLARKE, J., did not sit.

FELLOWS, C. J. This case comes to the Law Court on exceptions to a decree of a Justice of the Superior Court, sitting in Cumberland County as the Supreme Court of Probate. The Justice of the Supreme Court of Probate sustained the appeal of Jane Walsh Waning, who appealed from a decree of the Judge of Probate for Cumberland County allowing the Will of Patrick M. Silke, and after hearing, the Supreme Court of Probate sustained the appeal, reversed the Cumberland County Probate Court and disallowed the will.

In the bill of exceptions filed by Thomas J. Silke, and allowed by the court, it is stated that the Reverend Patrick M. Silke, a Roman Catholic priest, pastor for many years of the St. Dominic's Church, Portland, died on September 28, 1953, at the age of 79. On October 8, 1953, Thomas J. Silke

the brother of the deceased and the person named as the executor in the alleged will of the said deceased dated May 17, 1950, presented said alleged will of May 17, 1950, to the Probate Court within and for Cumberland County to be proved and allowed as the Last Will and Testament of Father Silke. Hearing was held before the Judge of Probate of Cumberland County on December 30, 1953. At the Hearing before the Probate Court the three attesting witnesses to the said alleged will of May 17, 1950 testified, and the Probate Court by its decree of December 30, 1953 decreed that said will be approved and allowed as the Last Will and Testament of the deceased, Father Silke.

Thereafter on January 20, 1954, Mrs. Jane Walsh Waning, a grand niece of the late Father Silke, and an interested person, filed an appeal from the decree of the Probate Court, setting forth the following reasons for appeal:

1. At the time the instrument purporting to be the Last Will and Testament of Patrick M. Silke was executed, to wit, on May 17, 1950, the said Patrick M. Silke did not have sufficient mental capacity to make a valid will.

2. On May 17, 1950, the said Patrick M. Silke did not have testamentary capacity.

3. There is no evidence that the said Patrick M. Silke knew that the said instrument purportedly executed by him on May 17, 1950, was his Last Will and Testament.

4. The said Patrick M. Silke was unduly influenced to execute the said instrument purporting to be his Last Will and Testament and dated May 17, 1950.

5. The said Patrick M. Silke was induced to execute said instrument purporting to be his Last Will and Testament and dated May 17, 1950, by fraud.

Hearing was had on the appeal, before a Justice of the Superior Court, at the June, 1954 term of the Superior

Court within and for the County of Cumberland, sitting as the Supreme Court of Probate. Testimony was taken out on June 25, 28 and 29, 1954. The matter was then taken under advisement with the decision reserved to be rendered in vacation. The case was argued in writing by counsel.

On September 3, 1954, being in vacation, the Superior Court sitting as the Supreme Court of Probate issued its decree. It found "as a fact that the late Patrick M. Silke on May 17, 1950, at the time he allegedly executed an instrument purporting to be his Last Will and Testament did not have testamentary capacity."

It was then ordered and decreed that the appeal was sustained; the decree of the Probate Judge allowing the will of May 17, 1950 of Patrick M. Silke was reversed and set aside, and the said will was disapproved and disallowed, and the case was remanded to the Probate Court for further proceedings not inconsistent with the decree.

The Superior Court did not make any finding or ruling on the fourth reason for appeal, which asserted the invalidity of the will of May 17, 1950 on the ground of undue influence, nor upon the fifth reason for appeal which asserted the invalidity of said will on account of fraud.

The bill of exceptions filed by Thomas J. Silke further states that his rights are substantially prejudiced thereby for the reason that the said court erred in finding without the support of any credible evidence, but contrary to all the evidence, that the deceased lacked testamentary capacity at the time of his execution of the said will of May 17, 1950.

The record of evidence taken in the Supreme Court of Probate shows that there was no contest in the Probate Court, and the testimony of the subscribing witnesses only was taken. On appeal, the following facts appear:

It was first stipulated and agreed by the parties that the estate of Rev. Patrick M. Silke is valued "between $150,000

and $160,000." The testimony of the subscribing witnesses to the will was next presented to the Supreme Court of Probate, to prove testamentary capacity and the due execution on May 17, 1950, which date was several months after Father Silke's forced retirement as a priest, due to his mental condition. On May 17, 1950 Thomas Silke telephoned one Walter Steele and asked him to come to his (Thomas Silke) private office at the Grand Trunk Railroad yard to act as a witness to Father Silke's will and to bring his brother John Steele. Thomas Silke arranged also to have Michael McGee who worked under Thomas Silke at the Railroad yard. McGee came "to do Tom Silke a favor." The signing took place between one and two-thirty in the afternoon and the witnesses stated that Father Silke was alone in his brother's private office in the Railroad yard, although Thomas Silke was in the building and came to his office once at least before, or during, the signing.

It does not appear how Father Silke got to the office, nor by whom and under what circumstances the instrument was drafted. There was only evidence that Father Silke was alone, and that the execution took only sufficient time for Father Silke and the attesting witnesses to sign the document. There is no evidence that clearly establishes the fact that Father Silke knew the instrument to be a proposed will, or that he read it, or had had it read to him. The witnesses knew Father Silke as pastor of the Church, but none of the witnesses had seen him for many months. They stated he was in their opinion of sound mind, although they testified that Father Silke made very little if any conversation beyond greetings and asking them to witness his signature.

There was evidence presented at the extended and full hearing in the Supreme Court of Probate, lasting several days, from which the justice presiding could find that Patrick M. Silke, born in 1874, was a Catholic priest and carried on his clerical duties as a priest for many years at various

towns in northern Maine. He came to Portland in 1933 as pastor of St. Dominic's parish. He was quiet, capable, intelligent, and the "soul of kindness." The Church "seemed to come first always with him." His charitable work was extensive, especially with and toward Catholic institutions. He was wealthy and donated large sums to church and individuals. He had previously executed an instrument as his will on November 17, 1932, when 58 years old, in which he stated that his brother Thomas Silke was to receive $4,000, his sister Mary Coyne $2,000, with a discharge of mortgage on her home. Other relatives such as cousins were remembered, as well as certain charities such as the Madigan Hospital at Houlton, and the Holy Innocents Home at Portland. The major portion of his estate was given to a trustee for "the purposes I have expressed to him." The residue was bequeathed to the Holy Innocents Home.

The alleged will of May 17, 1950 gave the brother Thomas Silke, as sole beneficiary, all his property, although it is stated that a mortgage on property at 103 Monument Street in Portland "shall not be called or foreclosed during the lifetime of my sister Mary E. Coyne."

Beginning around 1944, Father Nelligan and Father Houlihan, who were associated with Father Silke, and Mrs. Oliver who did his bookkeeping, among others, began to notice unusual actions on the part of Father Silke which indicated to them that he was breaking down mentally. On a number of occasions, he would stubbornly refuse to sign the weekly checks for various expenses, on the basis that he did not have any money. He would talk about his past days at Houlton, and repeat again and again the story about how one of his eyes froze, which finally necessitated its removal. His condition became such that it was necessary for Mrs. Oliver to handle all his business affairs as well as the administrative matters of the parish. By 1948 he was in semi-retirement. As Father Nelligan testified, "he didn't do many

activities of the parish. The other priests took care of the sick and attended to the other duties in the parish." In August, 1949, at an important church function, he flicked the lights on and off continually throughout the Mass. In this regard, Father Houlihan testified, ". . . the mind was so far gone that it was better that he hadn't gone (to the church)."

Although Father Silke had been a priest for nearly a half century, he would depart from the usual orderly procedure of the Mass, forget to say certain prayers and in general acted completely confused. Sometime in 1948 it became necessary for Bishop Feeney to assign one of the curates to assist and direct him during Mass. In most instances, they had to take complete charge of the Mass—pointing out in detail what had to be done. Father Houlihan remarked that this was most unusual and the first time he ever saw or heard of any such situation.

Dr. Francis M. Dooley, who had known Father Silke personally for years, and who had been his attending physician, testified fully concerning his mental condition. Dr. Dooley said that as early as 1943 or 1944, Father Silke was suffering from the degenerative disease of the arteries known as cerebral arteriosclerosis which is a chronic progressive disease in which hardening and other changes of the artery walls interfere with the blood supply to the cerebral hemispheres of the brain. The resulting brain damage caused an impairment of the intellectual functions—defective attention, disorientation, impaired memory, faulty judgment, poor insight, loss of ability of concentration, loss of logical reasoning and frequent attacks of amnesia. In the fall of 1948 he concluded that the extent of damage to Father Silke's brain was such as to seriously affect his comprehension.

Dr. Dooley was of the opinion that Father Silke was definitely of unsound mind as early as the fall of 1948, more

than a year and a half before the second will was executed, and his condition grew progressively worse.

Although cross examined at length, particularly as to whether Father Silke would have any "lucid intervals" after 1948, Dr. Dooley made it clear that he could not do anything that required a comprehension of various factors—not even a simple business matter. He could, however, do simple things such as putting on his clothes and washing his hands, etc. In response to the following question propounded by the court: "Can you tell me whether that condition which you found would be constant or whether there were periods when you saw him when he appeared to be his normal self?" Dr. Dooley answered: "His condition was one that was more constant in character. The condition got progressively worse."

The mental condition of Father Silke had progressed to such an extent by the fall of 1949 that the curates under him advised Bishop Feeney that something should be done to protect the parish. Compared with his condition in 1946, it was much worse at that time. In October, 1949, Bishop Feeney, in the presence of Father Houlihan and Father Nelligan, made a personal examination of Father Silke. As an outcome of the examination, Father Silke was retired because of his inability to take care of any matters pertaining to the parish. He was prohibited from saying Mass, and Father Nelligan was made the administrator of the parish.

Father Silke's relations with his sister Mrs. Mary E. Coyne were close for many years. Her visits were frequent. She was a widow and received from him financial support, such as paying her taxes, and making frequent gifts of money to her. Mrs. Coyne died after the alleged will was signed and about a month before the death of Father Silke.

After his retirement, Thomas Silke visited Father Silke every night at the rectory for the seven months immediately

preceding the execution of the second will. Previous to his forced retirement, Thomas Silke did not see his brother except on rare occasions a few times each year, and usually on holidays. Since Thomas Silke did not testify, it is not known why the visits became so frequent at the last or what transpired between the two brothers.

On each of the afternoons for seven months before the execution of the alleged will, Father Silke was brought to the home of his housekeeper. There he would have his eye treated by her. He would stay there, three or four hours, playing with toys of the children, go to the telephone and make believe he was calling someone, sit and stare into space, and whatever little conversation he made was confused. On one occasion while he was left alone, he wandered out of the house and was only returned after a search by Mr. and Mrs. Oliver. During these visits he did not recognize people whom he had known for years, such as Mrs. Oliver who had done his daily bookkeeping and Miss King who was his housekeeper for years. He was not capable of transacting the simplest kind of business. His bookkeeper did it for him. Both Mrs. Oliver and her husband testified to facts from which the ordinary person might consider clear evidence of senility.

On May 19, 1950, Father Silke fell and injured his back and was hospitalized for a short time. Dr. Dooley stated positively that Father Silke was not of sound mind on May 19th, or on the day of the execution of the alleged will two days before.

Eleanor McKinnon, a trained nurse, who cared for Father Silke when in the hospital May 19, 1950, and after leaving the hospital up to the date of his death, testified that he always insisted that he had no money and could not pay nurses; that he never recognized his sister who called almost every day; that when the brother Thomas Silke called, Thomas endeavored to impress upon others present

that Father Silke's mind "was as clear as a bell." Father Silke, however, did not recognize his brother and had to be told who he was. He always stated that he was a very poor man. He told Mrs. McKinnon that she could have all his property after his death, including the rectory. "I would give you money, but I never had any, I haven't got a cent."

The evidence offered by the proponent to meet and contradict the testimony offered by the contestant was testimony of Miss Margaret McDonough, a first cousin of the testator and also a first cousin of Thomas Silke, the sole beneficiary under the instrument dated May 17, 1950, Charles M. Murphy, a monument salesman, and Edward R. Twomey who assisted the testator in the preparation of his income tax returns, and Dr. William R. McAdam an eye specialist.

Margaret McDonough testified that she visited Father Silke at intervals of approximately twice a month between October 1949 and May, 1950; that he recognized her; that these visits usually took place in the afternoon and that Father Silke was at home on all of these occasions; that he knew where his sister lived; that she observed him saying Mass privately and never noticed any errors or omissions; that his conversation relative to parish affairs always seemed all right; that she did not notice any mental confusion.

Mr. Murphy testified that on December 12, 1949 at his instigation, Father Silke signed a contract for the purchase of a monument; that Father Silke knew what kind of stone he wanted; that Father Silke told Mr. Murphy that he wanted the names of his father and mother on the stone; that about a week after his visit he had occasion to visit Father Silke, on which occasion Father Silke recognized Mr. Murphy and that mentally Father Silke seemed normal.

On cross examination it developed that prior to Mr. Murphy's visit to Father Silke, he had discussed in detail with

Father O'Toole the kind of monument which Father Silke wanted and that the order was prepared by Mr. Murphy from this conversation with Father O'Toole.

Edward R. Twomey, a Teller at Canal Bank, testified that he had associated with Father Silke for many years in the preparation of his income tax returns; that in 1950 Mr. Twomey went to see him as usual; that the testator recognized him and the purpose of his visit; that Father Silke gave Mr. Twomey the figures; that Mr. Twomey then went home and prepared the return, after which he took the return back to Father Silke, who signed a check for the amount indicated; that in 1950 he talked with him on current events and "small talk" and that Father Silke appeared normal.

On cross examination, and after considerable questioning, Mr. Twomey finally admitted that he did not know who prepared the figures and had no specific recollection of 1950, and that the reason he was sure he went up there in that year was because of the exhibits and copies of exhibits which Mr. Twomey had at home.

Dr. William R. McAdam, an eye specialist who treated Father Silke once in 1948 and once in 1949, found from these two examinations of Father Silke's eyes that he had a "mild arteriosclerosis in keeping with a man of 75 years." He was not confused. He "talked reasonably" when asked questions. "There was not enough that showed in the eye" to indicate arteriosclerosis sufficient to affect the brain.

The certificate of death showed that Patrick M. Silke died September 28, 1953 at the age of 78 years, 11 months, 19 days, and that cause of death was "cerebral arteriosclerosis, senility." The death certificate was signed by Dr. Eugene E. O'Donnell.

Revised Statutes, 1954, Chapter 169, Section 1, provides as follows: "A person of sound mind, and of the age of

twenty-one years, and a married person, widow or widower of any age, may dispose of his real and personal estate by will, in writing, signed by him, or by some person for him at his request, and in his presence, and subscribed in his presence by three credible attesting witnesses, not beneficially interested under said will." There is no exception or qualification to the requirement that a person must be of sound mind in order to make a valid will, and the burden rests upon the proponent of the will to prove affirmatively that the testator was of sound mind when he made the will. Hence in probating a will the sanity of the testator must be proved. Sanity is not to be presumed. The word sanity is used in its legal and not its medical sense.

In law, every mind is sound that can reason and will intelligently, in the particular transaction being considered; and every mind is unsound or insane that cannot so reason and will. The law investigates no further. This definition differentiates the sound from the unsound mind, in the legal sense. A disposing mind involves the exercise of so much mind and memory as would enable a person to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds; and a disposing memory exists when one can recall the general nature, condition and extent of his property and his relation to those to whom he gives, and also to those from whom he excludes, his bounty. Mere intellectual feebleness must be distinguished from unsoundness of mind. The requirements of a "sound and disposing mind" does not imply that the powers of the mind may not have been weakened or impaired by old age or bodily disease. The weakest kind of a sound mind may make a will, but it must be a legally sound mind. *Chandler Will Case,* 102 Me. 72, 73; *Hall* v. *Perry,* 87 Me. 569; *Martin, Appellant,* 133 Me. 422; *Rogers Appellant,* 126 Me. 267; *Pliny Crockett, Aplt.,* 147 Me. 173; *In re Will of Loomis,* 133 Me. 81.

Under these legal principles arises a pure question of fact upon the first proposition, which it is incumbent upon the proponents or appellees in the first instance to prove, namely that the testator on the day and time that he signed the will was possessed of testamentary capacity. *Chandler Will Case,* 102 Me. 72, 89; *Appeal of Packard,* 120 Me. 556; *Pliny Crockett, Aplt.,* 147 Me. 173.

The burden rests upon the proponents to affirmatively prove the capacity to make a will. In probating a will the sanity of the testator must be proved and is not to be presumed. *Chandler Will Case,* 102 Me. 72, 87. *Pliny Crockett, Aplt.,* 147 Me. 173, 179.

The burden of proof is upon the party propounding the will to establish its validity by a fair preponderance of the weight of the evidence. *Rogers, Appellant,* 126 Me. 267, 283.

On the issue of competency to make a will, the burden of proof is upon the proponent. It is for him to substantiate soundness of mind, even though the contestants offer no evidence at all. *Martin, Appellant,* 133 Me. 422, 428.

The value of the testimony of the subscribing witnesses is to be determined with reference to his opportunity for observations, his skill and care in observing, his intelligence and powers of discernment and memory. *Martin Appellant,* 133 Me. 422, 431.

Except in rare instances, the appearance and conduct of the testator at the moment of executing the will does not furnish a sufficient basis for determining the mental condition at that time. This can often be determined only from a consideration of his conduct, behavior, methods of thinking, and the like, extending over a long period of time. Furthermore any other rule would leave those who were present at the time of the execution as the only witnesses whose evidence would be admissible as to capacity, and would render fraud easy and safe. For these reasons a wide range of in-

quiry is presented when the capacity of the testator is involved; and evidence of testator's conduct, emotions, methods of thought, and the like, for a very considerable period before and after the execution of the will, is admissible to show his capacity at the moment of making the will. The evidence must be restricted to a reasonable time on either side of the execution of the will. See *Page on Wills,* Vol. 2, Section 792, and *Chandler Will Case,* 102 Me. 72.

There may be no direct evidence that on the day and at the hour the will was signed, testator was not sane, but it does not follow that proof of incapacity at the very moment must be made by eye witnesses on that occasion. Proof of insanity prior thereto, permanent in kind and progressive, raises a presumption of continuity. *Martin, Appellant,* 133 Me. 422, 434.

An attending or family physician's opinion as to the mental health of his patient is competent; such patient's condition some time before and some time after making the will is relevant as tending to show the conditions of mind when it was executed. *Martin, Appellant,* 133 Me. 422, 433.

The rule is firmly established that upon exceptions to findings of the sitting Justice in the Supreme Court of Probate upon questions of fact, if there is any substantial evidence to support the findings, the exceptions must be overruled. *Appeal of Packard,* 120 Me. 556, 115 Atl. 173.

The findings of a Justice of the Supreme Court of Probate in matters of fact, are conclusive, if there is any evidence to support them. It is only when he finds facts without evidence that his finding is an exceptionable error in law. *In Re Simmons,* 136 Me. 451, 12 Atl. (2nd) 417.

The validity of the decree of the Supreme Court of Probate can be challenged before this court only by exceptions; and the findings of the justice of said court in matters of

fact are conclusive if there is any evidence to support them. *Pliny Crockett, Aplt.,* 147 Me. 173, 84 Atl. (2nd) 808.

Questions of fact once settled by the Justice of the Supreme Court of Probate, if his findings are supported by any evidence, are finally decided. Such justice and he alone is the sole judge of the credibility of witnesses and the value of their testimony. It is only when his findings are made without any evidence to support them that we can disturb them on exceptions as erroneous in law. *Heath et al., Aplts.,* 146 Me. 229, 79 Atl. (2nd) 810.

The credibility of testimony, its capacity for being believed is one of the things to be settled before weighing it. *Weliska's Case,* 125 Me. 147.

The testimony of a witness as to his belief and motive is not usually, if ever, susceptible of direct contradiction. The fact that the testimony of a party to a suit is not directly contradicted does not necessarily make is conclusive and binding upon the court. Of course, it is not to be utterly disregarded and arbitrarily ignored without reason. It should be carefully considered and weighed with all of the other evidence in the case, and with all of the inferences to be properly drawn from facts established by the evidence; but if, on the whole case, it appears that such testimony is untrue, the court is not required to put the stamp of verity upon it, merely because it is not directly contradicted by other testimony. *Mitchell* v. *Mitchell,* 136 Me. 406, 11 Atl. (2nd) 898; cited with approval in *Pease* v. *Shapiro,* 144 Me. 195, 67 Atl. (2nd) 17.

The law relating to testamentary capacity is certain, plain, and easily understood. The difficulty in deciding disputed questions of fact lies in the application of the law to the facts.

It is easy to decide that a person has testamentary capacity when he lives in the bright sunshine of a clear and vigorous mind with a healthy body. It is also easy to decide the fact that capacity is lacking, when the person is in the darkness of unquestioned delirium, imbecility or idiocy. When, however, the vigorous mind of an individual is attacked by a degenerative disease that is progressive and is to end in senility and mental incompetence, and it has reached the twilight zone, it is impossible to ascertain with certainty the time when the light of reason goes out.

We do not and cannot know the true condition of our own minds at any given moment, much less can we hope to know the condition of the mind of another. Insanity or unsoundness of mind, as a practical proposition, is but the apparent inability of a person to wear the veneer of social and business standards which have been established by the customs and actions of the great majority. The law, however, does not expect and does not require the impossible, and the trier of facts in a civil case needs only to accept the probabilities shown by a preponderance of the evidence presented, and if there is sufficient credible evidence on which to base his decision it is final.

In this case, as in all contested will cases, the evidence was conflicting. The burden of proof was upon Thomas J. Silke, the brother and sole legatee, as proponent, to establish by a fair preponderance of the evidence that Patrick M. Silke at the time when he signed the alleged will was of sound mind. It was for him to so satisfy the Justice sitting as the Supreme Court of Probate. Sanity, in a will case, is not presumed.

The undisputed evidence shows Father Silke to be a capable and educated priest, born in 1874, who carried on his duties without question as to his mentality, until about

1943 or 1944 when his actions indicated to his associates some mental disturbance. His friend and physician diagnosed his trouble as cerebral arteriosclerosis and testified that his mental condition grew steadily worse, and that at the time of signing the alleged will he was not capable of conducting even small and ordinary business affairs. This testimony of the doctor was sustained and corroborated by his associate priests, by his bookkeeper, and by others who knew him well and saw him frequently, and who testified to facts that they observed, that indicated an increasingly abnormal and enfeebled mental condition.

The instrument signed on May 17, 1950 might be considered, within itself, as evidence in the contestant's favor. The proponent, Thomas J. Silke, is named the sole beneficiary of a large estate by a brother who in past years he only occasionally saw. The sister (then living) who had to be financially aided by Father Silke over the years, is given nothing. Under the circumstances in this case, such a will is not in keeping with the lifetime habits or inclinations of the priest when he was mentally competent. It might well be argued that such a will made under all the circumstances by such a man "did not show a rational being." Then too, Thomas J. Silke did not testify, and he could probably have told why the alleged will was signed in the railroad yard; whether Father Silke consulted an attorney or any other person about the contents of the proposed will; who drafted the proposed will; who read it to Father Silke if it was read to him; whether Father Silke was apparently normal at the time of signing, and other vital questions that perhaps only the proponent knew.

There was no error. The Justice sitting as the Supreme Court of Probate could well find as a fact, from sufficient

credible evidence, that on May 17, 1950 Father Silke did not have the necessary testamentary capacity.

*Exceptions overruled.*

*The costs and expenses of the p a r t i e s, including reasonable counsel fees, to be fixed by the Supreme Court of Probate in its decree and paid from the estate of Patrick M. Silke.*